IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-72,556




 


VICTOR HUGO SALDANO, Appellant



v.



THE STATE OF TEXAS






ON DIRECT APPEAL

CAUSE NO. 199-80049-96 FROM THE 199TH DISTRICT COURT

COLLIN COUNTY




 Hervey, J., delivered the opinion of the Court in which Keller, P.J., Meyers,
Keasler, and Holcomb, JJ., joined. Price, Womack, and Johnson, JJ., concurred. 
Cochran, J., concurred in points of error one, two, three, and five but otherwise joined the
opinion of the court. 

O P I N I O N


 In 1996, appellant was convicted of capital murder and sentenced to death. The conviction
was upheld, but the death sentence was overturned in federal habeas corpus proceedings based on
a procedurally defaulted claim of prosecutorial misconduct at appellant's 1996 trial. (1) In 2004,
appellant was again sentenced to death at another punishment hearing in state court. Appellant raises
66 points of error on direct appeal to this Court. Finding none of these points to present reversible
error, we affirm.

 The record reflects that, since his 1996 trial, appellant has resided on death row, where he
has committed numerous acts of misconduct that resulted in him being placed in the most restrictive
and isolated level of death row. (2) The defense claimed that it intended to explain this misconduct
with testimony from a psychiatrist (Peccora), who treated appellant on death row "on well over 100
occasions" from "late 1997 or early 1998" until "early 2001." It appears that Peccora would have
testified that the conditions on death row caused appellant to suffer psychological deterioration and
to misbehave. The State claimed, and the trial court agreed, that the defense could not present
Peccora's testimony without first having appellant examined by a state psychiatric expert pursuant
to this Court's decision in Lagrone v. State. (3) Appellant would not submit to a Lagrone examination,
and Peccora's testimony was not presented.

 We understand appellant to have three basic, separate complaints on appeal regarding
Lagrone. First, appellant should not have been required to submit to a Lagrone examination. 
Second, if appellant was required to submit to a Lagrone examination, this examination should have
been limited to rebuttal of Peccora's testimony on appellant's mental decline. And, third, if
appellant was required to submit to a Lagrone examination, the State should have been precluded
from using any evidence derived from this examination on the future-dangerousness special issue. 
We find appellant's actual claims at trial to have been less clear. 

 Points of error one through three and five relate to the trial court conditioning the
admissibility of Peccora's testimony on appellant submitting to a Lagrone examination. Specifically,
appellant claims that the trial court constitutionally erred by not guaranteeing that any evidence the
State obtained during this Lagrone examination would be limited to rebutting Peccora's testimony
concerning appellant's mental decline on death row and by further failing to guarantee such evidence
not be used by the State on the future-dangerousness special issue. In point of error one, appellant
claims that this led the trial court "to incorrectly bar [Peccora's] expert testimony and deny the
defendant's motion to dismiss the death penalty proceedings" before the punishment hearing began. 
In point of error two, appellant claims that this also "unconstitutionally permit[ted] the State to
introduce evidence [at the punishment hearing] of misconduct by the defendant while on death row." 
In point of error three, appellant claims that this constitutional error also "effectively" prevented him
from presenting constitutionally relevant mitigating evidence (in the form of Peccora's testimony
concerning appellant's mental decline on death row) at the punishment hearing. (4) And, in point of
error five, appellant claims that the trial court should have granted him a new trial based on these
claims.

 The record reflects that the Lagrone issue first arose rather late in the proceedings during a
November 5, 2004, hearing on a written motion that appellant had filed on October 21, 2004, in the
middle of individual voir dire. (5) The second part of that motion requested a ruling from the trial court
that the State was constitutionally prohibited from seeking another death sentence and "therefore that
[appellant] be sentenced to life imprisonment." The third part of the motion alternatively requested
an in limine ruling from the trial court "to exclude all evidence of [appellant's death-row
misconduct] subsequent to his first trial in July 1996." (6)

 Appellant claimed at the November 5, 2004, hearing on this motion that the State should not
be permitted to seek another death sentence or, alternatively, not be permitted to use any evidence
of appellant's death-row misconduct after his 1996 trial because of the procedurally defaulted claim
of prosecutorial misconduct at appellant's 1996 trial. See Footnote 1. (7) Appellant evidently claimed
that he would not have misbehaved on death row but for this "misconduct" by the State. To support
these claims, appellant stated that he intended to introduce Peccora's testimony at the hearing to
show appellant's mental decline on death row since his 1996 trial. (8)

 [THE DEFENSE]: Sure. And the first part of the motion won't be the focus today. 
We're looking just, really, at the second part and the third part.


 And regarding those parts, there are just two factual issues that we need to put
evidence on.


 The first factual issue is whether [appellant] has suffered a decline in his cognitive
abilities and emotional stability as a result of his isolation on death row; and the
second issue is whether [appellant] would have committed aggressive acts while
incarcerated were it not for the isolation on death row.


 [THE COURT]: Gotcha.


 [THE DEFENSE]: Now, in legal terms, the way this fits in is, the State should not
be able to enjoy the fruits of [the procedurally defaulted claim of prosecutorial
misconduct at appellant's 1996 trial] that it committed eight and one-half years ago.


 And if the Court finds that [appellant] has suffered a decline in his cognitive abilities
and emotional stability-and, your Honor, it doesn't require a finding on our part that
he is psychotic, we're not arguing he's not competent to stand trial; we're only
arguing a significant decline in cognitive ability and emotional stability.


 If that's the case, our argument is he may no longer be tried. The State committed
[the procedurally defaulted claim of prosecutorial misconduct at appellant's 1996
trial] by putting him on death row, they caused him to be diminished as a result of
many years in isolation there, and they can't enjoy the fruits of that at the new
sentencing proceeding today.


 And, in fact, he can't even be evaluated fairly as a future danger because he's not just
the same person today, and the statute requires an evaluation of future dangerousness
as of the time of trial.


 Second, on the issue of whether [appellant] would have committed aggressive acts
while incarcerated if not for the isolation that he was subjected to, the question is
whether the State can present evidence of his misconduct on death row on the issue
of future dangerousness.


 And our position is that the State committed the primary illegality here [with the
procedurally defaulted claim of prosecutorial misconduct at appellant's 1996 trial].


 If the State can show by a preponderance of the evidence that the defendant's
misconduct on death row would have occurred anyway, then we have nothing to
complain about.


 If you think of this in terms of an illegal search and seizure, and the fruits of an
illegal search and seizure, clearly the illegality occurred. That means that the State
can certainly try to overcome that illegality; show that, for instance, the evidence
would have been obtained anyway; but they have the burden of showing that this
misconduct would have occurred in any case.


 We maintain that it's very clear from the testimony we'll present that the misconduct
occurred precisely because of the isolation on death row that the State illegally placed
him in.


 The State claimed that appellant should not be permitted to present Peccora's testimony
without the State having an opportunity to have appellant examined by a state psychiatric expert, and
the trial court agreed.

 [THE COURT]: Let me get something up front here.


 I have had a chance to read, during some of that testimony, that Lagrone case, and
I believe the State has a right to have [appellant] examined if the State's-if the
defense is going to offer the evidence along the lines set out in [Peccora's] affidavit,
which I've now reread.


 The defense would not agree to a Lagrone examination "for the purposes of this pretrial
motion" because of the risk that appellant's "examination to a psychiatrist of the State could actually
be used against him at trial."

 [DEFENSE LAWYER #1]: Well, let me-let me make this even more clear.


 The reason that we're putting that into evidence at this point is, we are not going to
allow [appellant] to be looked at by a psychiatrist.


 [THE COURT]: I gotcha.


 [DEFENSE LAWYER #1]: He'll invoke his Fifth Amendment right.


 [DEFENSE LAWYER #2]: Your Honor, may I add?


 I'd like to point out that we're being placed in a situation risking that [appellant's]
testimony-[appellant's] examination to a psychiatrist of the State could actually be
used against him at trial. Faced with that possibility, we can't have the-our client
examined for the purposes of this pretrial motion. It's just a risk that we can't run.

 

 The record, therefore, reflects that appellant took the position at this November 5, 2004,
hearing that any evidence obtained by the State during a Lagrone examination might be used by the
State on any issue at the punishment hearing (including future dangerousness). At this point,
appellant had not alerted the trial court to any claim that the trial court should guarantee that a
Lagrone examination be limited to rebutting any testimony by Peccora on appellant's mental decline
and not to prove future dangerousness.

 On Friday, November 12, 2004, the State rested its punishment hearing case-in-chief during
which the State had presented evidence of appellant's death-row misconduct. On Monday morning,
November 15, 2004, appellant filed another written motion requesting that the trial court reconsider
its earlier ruling on the Lagrone issue. (9) In this November 15, 2004, motion, appellant offered for
the first time to submit to a Lagrone examination. Appellant also specifically alerted the trial court
for the first time to the claim that this Lagrone examination should be limited to rebutting any
testimony by Peccora on appellant's mental decline.

 This motion also requested that a hearing be scheduled five days later on November 20, 2004,
because that was "the only possible date for [Peccora's] voluntary attendance." This motion further
"encourage[d] the Court to have the jury begin deliberations prior to any hearing, with the jury
simply refraining from pronouncing its verdict before the hearing." This motion finally asserted that
appellant was "willing to wait and have a hearing held after the verdict, in the context of a motion
for a new trial, which in the present case might better be described as a motion for reconsideration
of the sentence."

 Appellant's November 15, 2004, motion contained no claim that the trial court's earlier
ruling on the Lagrone issue was effectively preventing appellant from presenting constitutionally
relevant mitigating evidence to the jury in the form of Peccora's testimony concerning appellant's
mental decline. And, appellant made no claim that he wanted to present Peccora's testimony to the
jury at the punishment hearing. In relevant part, appellant's November 15, 2004, written motion
stated:

 Defendant continues to insist that the Court ruled incorrectly in barring [Peccora]
from testifying at the hearing of November 5, 2004 without a prior examination of
[appellant] by the State's expert, but more seriously, as the Court recognized at the
hearing, its decision created a risk for the Defendant-that the State would use its own
examination of the Defendant not only on the pre-trial motion of Defendant's
impairment, but to prove future dangerousness before the jury. The Defendant
returns to the Court in this motion to request that the Court develop some device to
permit it to overcome its dilemma.

* * *

 Defendant has two proposals for the Court to overcome the problem it faces in
needing to consent to an examination of [appellant] prior to any testimony by
[Peccora]. First, Defendant asks the Court to order that the prosecution be permitted
to examine [appellant], but on condition that the examination not be used for any
purpose other than the question of his decline in cognitive ability and emotional
stability on Death Row. Because [Peccora] will need to travel to McKinney from
Houston, and because [Peccora's] mother is receiving chemotherapy this week and
his patient schedule is therefore especially tight, the Defendant also requests that the
hearing be scheduled for Saturday, November 20, since that is the only possible date
for [Peccora's] voluntary attendance. The Defendant appreciates the difficulties that
this causes the Court, but is unable to demand more of [Peccora] at a very trying time
for him. Defendant would encourage the Court to have the jury begin deliberations
prior to any hearing, with the jury simply refraining from pronouncing its verdict
before the hearing.


 Second, the Defendant is willing to wait and have a hearing held after the verdict, in
the context of a motion for a new trial, which in the present case might be better
described as a motion for reconsideration of the sentence. . . . Defendant would have
preferred to have any competency-type issue resolved pre-trial, but in the context of
the difficulty that [Peccora] will have attending a hearing, it is willing to accept this
alternative, of the Court ruling against the Defendant for the purpose of the trial, but
reconsidering the issue with an evidentiary hearing post-trial.


 The trial court held a hearing on appellant's November 15, 2004, motion on the morning that
it was filed. At this hearing, the defense agreed with the trial court that it was requesting the trial
court to reconsider its earlier ruling on the Lagrone issue.

 [THE COURT]: This is-it's titled basically the same way. They-the defense wants
me to reverse my ruling barring [Peccora] from testifying about [appellant's]
deterioration, is the best word I can recall-call it, because of his confinement death
row for the last several years.


 I had earlier ruled that I would not let-the issue arose that, if the I had allowed
[Peccora] to testify, that the State was going to insist on having [appellant] examined
by their expert, which I tended to agree they could do because of the case law as I
read it. At that point, as I recall, the defense decided that it would not-they did not
want to insist on [Peccora] testifying; but, instead, offered his affidavit which he had
attached to the original motion instead, which I, of course, considered, and did
consider.


 And at that point that pretty much any of the-now, the State has filed a controverting
affidavit; I believe I saw that one day last week.


 And that was by [Price]? Is that your doctor?


 [STATE]: Yes, your Honor.


 [THE COURT]: Which I also-but I had earlier, before I'd actually seen [Price's]
affidavit, I had denied the defense motion, and let it go at that. I have not done more
on it.


 And then Price's motion was filed, and now the defense has filed a motion-I think
it's asking to reconsider, [defense lawyers]? Is that a fair statement?


 [DEFENSE LAWYER]: Yes.

 

 The State claimed at this hearing that the defense was "only stalling and asking for a delay
in tactics." The State also stated that it wanted to make it "crystal clear" that it had never requested
the trial court to bar Peccora's testimony, and that, in the pretrial context in which Peccora's
testimony was initially offered at the November 5, 2004, hearing, the State had requested a Lagrone
examination "to present controverting evidence if the defense presented that evidence." The State
also requested the trial court to deny appellant's motion because it was, among other things,
"untimely."

 The trial court expressed the view that a Lagrone examination "would probably open
everything up" about "anything relevant to [appellant's] mental state, including future
dangerousness, which is the defense concern."

 [THE COURT]: I did not have a chance to fully brief the-how far, if I could-if I
could even restrict your expert if he didn't-assuming [Peccora] was allowed to
testify, and then, consistent with my earlier ruling, then he would be entitled-the
State would be entitled then to have their expert examine [appellant], and what that
would open up.


 And my belief is that it would probably open everything up. And if your witness
testifies and-examines [appellant] and testified to whatever it is in response to
Mr.-[Peccora's] testimony going to be, which, generally, is going to be that
[appellant] deteriorated, degradated-degraded, I should say-on death row, I would
suspect your witness would be entitled to testify about anything relevant to his mental
state, including future dangerousness, which is the defense concern.


 So I don't know how I can-Mr. Franklin, I don't know how I can limit, under the
case law, their expert. I mean, I guess I could order it, but I'm not going to disregard
the law.


 So I don't know-I don't have-and the other option he suggests is to wait and have
a hearing after the verdict. I-


 The trial court ultimately denied appellant's request to limit a Lagrone examination to
rebutting Peccora's testimony on appellant's mental decline. Appellant made no claim that this
effectively prevented him from presenting constitutionally relevant mitigating evidence in the form
of Peccora's testimony. Appellant again would not submit to a Lagrone examination, and he did not
offer Peccora's testimony at the punishment hearing or any other hearing.

 The record fairly reflects that it was not until after the State had rested its case-in-chief at the
punishment hearing, during which it had presented evidence of appellant's death-row misconduct,
that appellant for the first time alerted the trial court to the claim that it should guarantee that a
Lagrone examination be limited to rebutting Peccora's testimony on appellant's mental decline. 
This was too late for appellant to have preserved for appeal the claims presented in points of error
one and two. See Tex. R. App. Proc. 33.1(a)(1)(A) (to preserve error for appeal, complaining party
must timely present claim to trial court with sufficient specificity to make trial court aware of
complaint); Lankston v. State, 827 S.W.2d 907, 909 (Tex.Cr.App. 1992) ("all a party has to do to
[preserve error] is to let the trial judge know what he wants, why he thinks himself entitled to it, and
to do so clearly enough for the judge to understand him at a time when the trial court is in a proper
position to do something about it").

 In addition, appellant made no claim, in either his November 15, 2004, written motion or at
the hearing on this written motion, that the trial court's ruling on the Lagrone issue effectively
prevented him from presenting constitutionally relevant mitigating evidence in the form of Peccora's
testimony on appellant's mental decline. See id. Appellant, therefore, failed to preserve for appeal
the claim presented in point of error three.

 Even if appellant had timely presented a claim to the trial court that its ruling on the Lagrone
issue prevented appellant from presenting constitutionally relevant mitigating evidence, appellant
still would not be entitled to appellate review of that claim under the principles discussed in Luce
v. United States, 469 U.S. 38 (1984). In Luce, the Supreme Court held that a trial court's in limine
ruling, (10) permitting a defendant's impeachment with a prior conviction, is not reviewable unless the
defendant testifies, because appellate review of these in limine rulings is difficult "outside a factual
context" also rendering any attempt to apply a harm analysis "wholly speculative." See Luce, 469
U.S. 41-43. (11) The considerations discussed in Luce apply with equal force here:

 Any possible harm flowing from a district court's in limine ruling permitting
impeachment by a prior conviction is wholly speculative. The ruling is subject to
change when the case unfolds, particularly if the actual testimony differs from what
was contained in the defendant's proffer. Indeed even if nothing unexpected happens
at trial, the district judge is free, in the exercise of sound judicial discretion, to alter
a previous in limine ruling. On a record such as here, it would be a matter of
conjecture whether the District Court would have allowed the Government to attack
petitioner's credibility at trial by means of the prior conviction.


 When the defendant does not testify, the reviewing court also has no way of knowing
whether the Government would have sought to impeach with the prior conviction. 
If, for example, the Government's case is strong, and the defendant is subject to
impeachment by other means, a prosecutor might elect not to use an arguably
inadmissible conviction.


Luce, 469 U.S. at 41-42.


 In a dissenting opinion in another case decided about sixteen years after Luce, Justice Souter
approvingly described the decision in Luce:

 We held [in Luce] that a criminal defendant who remained off the stand could not
appeal an in limine ruling to admit prior convictions as impeachment evidence under
Federal Rule of Evidence 609(a). Since the defendant had not testified, he had never
suffered the impeachment, and the question was whether he should be allowed to
appeal the in limine ruling anyway, on the rationale that the threatened impeachment
had discouraged the exercise of his right to defend by his own testimony. The answer
turned on the practical realities of appellate review.


 An appellate court can neither determine why a defendant refused to testify, nor
compare the actual trial with the one that would have occurred if the accused had
taken the stand. With unavoidable uncertainty about whether and how much the in
limine ruling harmed the defendant, and whether it affected the trial at all, a rule
allowing a silent defendant to appeal would require courts either to attempt wholly
speculative harmless-error analysis, or to grant new trials to some defendants who
were not harmed by the ruling, and to some who never even intended to testify.[ (12)] 
In requiring testimony and actual impeachment before a defendant could appeal an
in limine ruling to admit prior convictions, therefore, Luce did not derive a waiver
rule from some general notion of fairness; it merely acknowledged the incapacity of
an appellate court to assess the significance of the ruling for a defendant who remains
silent.


Ohler v. United States, 529 U.S. 753, 760-61 (2000) (Souter, J., dissenting).


 Appellate review of the trial court's ruling not limiting a Lagrone examination to rebutting
any testimony that Peccora might have provided at the punishment hearing on appellant's mental
decline is difficult "outside a factual context" and renders any attempt to apply a harm analysis
"wholly speculative." See Luce, 469 U.S. at 41-43. In Luce, appellate review of the trial court's in
limine ruling, permitting the eventually nontestifying defendant's impeachment with a prior
conviction, was practically impossible without a record showing actual testimony by the defendant
and actual impeachment of the defendant by the State with the prior conviction. See id. Similarly,
appellate review of the trial court's ruling in this case is practically impossible without a record
showing Peccora's actual testimony before the jury and the State's actual use before the jury of the
results of a Lagrone examination. It is practically impossible to "compare the actual trial with the
one that would have occurred" had Peccora testified and appellant submitted to a Lagrone
examination. See Ohler, 529 U.S. at 760-61 (Souter, J., dissenting). (13)

 In order to be entitled to appellate review of the trial court's ruling not limiting a Lagrone
examination to rebutting any testimony that Peccora might have provided on appellant's mental
decline, we decide that appellant was required to submit to the Lagrone examination and suffer any
actual use by the State of the results of this examination. See Luce, 469 U.S. at 41-43; Ohler, 529
U.S. at 760 (Souter, J., dissenting). It is noteworthy that this is the procedure the defendant in
Bradford followed before complaining on appeal that he was required to submit to an examination
by a state psychiatrist on the future-dangerousness special issue as a condition for the admission of
the defendant's psychiatric evidence on the same issue. See Bradford, 873 S.W.2d at 24-26
(Campbell, J., dissenting). (14) Points of error one through three and five are overruled.

 In point of error four, appellant asserts that the future-dangerousness special issue is
unconstitutionally vague. This special issue requires the jury to determine "whether there is a
probability that the defendant would commit criminal acts of violence that would constitute a
continuing threat to society." See Article 37.071, Section 2(b)(1), Tex. Code Crim. Proc. We have
previously held that this special issue is not unconstitutionally vague. See Jurek v. Texas, 428 U.S.
262, 274-76 (1976); Sells v. State, 121 S.W.3d 748, 767-68 (Tex.Cr.App. 2003) (future-dangerousness special issue not unconstitutionally vague for failing to define "probability"); Murphy
v. State, 112 S.W.3d 592, 606 (Tex.Cr.App. 2003) (future-dangerousness special issue not
unconstitutionally vague for failing to define "probability," "criminal acts of violence," and
"continuing threat to society"). Point of error four is overruled.

 In points of error six through sixteen, appellant claims that the trial court erroneously denied
his challenges for cause to eleven veniremembers: Vanlokeren (point six), Janszen (point seven),
Gilbert (point eight), Wilson (point nine), Kunesh (point ten), Powers (point eleven), Kleber (point
twelve), Gaus (point thirteen), Farris (point fourteen), Baird (point fifteen), and Garfield (point
sixteen). As a result of the trial court's denial of these defense challenges for cause to these eleven
veniremembers, appellant claims that he "suffered a detriment from the loss of [an] additional
peremptory strike" and that "objectionable and biased jurors to the defense were seated on the Jury."

 We review a trial court's ruling on a challenge for cause with "considerable deference"
because the trial court is in the best position to evaluate the veniremember's demeanor and
responses. See Colburn v. State, 966 S.W.2d 511, 517 (Tex.Cr.App. 1998). We will reverse a trial
court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." See id.

 Harm from the erroneous denial of a defense challenge for cause occurs: (1) when a
defendant uses a peremptory challenge to remove a veniremember whom the trial court should have
excused for cause at the defendant's request, (2) the defendant uses all of his statutorily allotted
peremptory challenges, and (3) the defendant unsuccessfully requests an additional peremptory
challenge which he claims he would use to remove another veniremember whom the defendant
identifies as "objectionable" and who actually sits on the jury. See Newbury v. State, 135 S.W.3d
22, 30-31 (Tex.Cr.App. 2004); Wolfe v. State, 178 S.W.2d 274, 281 (Tex.Cr.App. 1944) (op. on
reh'g). When these conditions are met, this Court has stated that the trial court's erroneous denial
of a defense challenge for cause harms the defendant by wrongfully depriving him of at least one of
his statutory peremptory challenges that he could have used to remove the juror whom the defendant
identifies as "objectionable." See Newbury, 135 S.W.3d at 31; Wolfe, 178 S.W.2d at 280.

 The record reflects that appellant used a peremptory challenge to remove each veniremember
identified in points six through fifteen after the trial court denied appellant's challenges for cause to
them. (15) The record also reflects that appellant received two extra peremptory challenges from the
trial court. Appellant, however, had no peremptory challenges left when he challenged Garfield for
cause (point sixteen). Garfield was seated as the twelfth juror after the trial court denied appellant's
challenge for cause to Garfield and appellant's request for additional peremptory challenges and after
appellant informed the trial court that the defense was "forced to accept" Garfield even though
Garfield was a juror whom the defense "would not want on the panel."

 [DEFENSE]: Your Honor, based on the Court's decision to deny the challenge [to
Garfield], we would request additional preparatory [sic] strikes at this time.


 Would, for the record, point out that, in addition to this juror that we would not want
on the panel, the challenges for cause that also having been made and used on the
other jurors-specifically Juror Number 189, Kleber-the challenges for cause that
were denied by the Court, 189, Dennis Kleber; 175, Joyce Powers; 127, Marie
Kunesh; 101, Don Wilson; 28, Patti Gilbert-especially Patti Gilbert-Juror-I'm sorry;
Juror 6, Bruce Van Lokeren.


 For those reasons, we request an additional peremptory at this time.


 [THE COURT]: Mr. Harrison I'm going to decline to do that. I'm conscious of your
position.


 I feel like the Court's been very careful in considering your challenges, and
somebody else may think otherwise; but I'll decline to give you additional challenges
at this time.


 So what says you all about the Juror Garfield?


 [DEFENSE]: Well, based on the decision, we are forced to accept.


 It is necessary to first address point of error sixteen (denial of defense challenge for cause to
Garfield). Appellant arguably identified Garfield as the "objectionable juror" (16) for purposes of
attempting to show that the trial court's rulings on his challenges for cause to the other
veniremembers identified in points six through fifteen harmed him by wrongfully depriving him of
at least one of his statutory peremptory challenges that he could have used to remove Garfield.

 Though it is not clear from his brief, appellant also appears to argue that the inclusion of
Garfield on his jury deprived him of a fair punishment hearing. (17) The record reflects that appellant
challenged Garfield for cause on the basis that Garfield "would require the defense to have the
burden to show mitigating circumstances." We have held that a veniremember is not challengeable
for cause "simply because he would place the burden of proof on mitigation on the defense." See
Ladd v. State, 3 S.W.3d 547, 559 (Tex.Cr.App. 1999).

 In addition, the portion of the record of Garfield's voir dire set out in appellant's brief does
not support the assertion that Garfield stated that he would require the defense to show mitigating
circumstances.

 Q. [DEFENSE]: Now, along with the [mitigation special issue] kind of comes into
play the Fifth Amendment.


 The Fifth Amendment, the defendant's right not to incriminate himself, applies to the
punishment phase just like it does the guilt-innocence phase.


 If a defendant does not testify in the punishment phase, the Judge will instruct you
to not consider that for any purpose. It's a nonfactor. Look at all the other evidence
that you have, make a decision based on all the other evidence, but don't consider
that.


 Do you have a problem following that law.


 A. [GARFIELD]: Um, I understand the law. I understand the Constitution. But I
have to say, in my own mind, a complete lack of defense-okay; in other words,
rebuttal to any of the claim-would psychologically be a factor for me.[ (18)]


 Garfield also stated that he could "keep an open mind and consider everything for mitigation
on the [mitigation special issue]."

 Q. [DEFENSE]: The law requires that you've still got to keep an open mind and
consider everything for mitigation on [the mitigation special issue].


 Can you promise me you can do that?


 A. [GARFIELD]: I can promise you that.

* * *

 Q. Okay. And the reason I ask, especially on [the mitigation special issue], we have
some jurors tell us that, you know, if I'm going to make a determination if there's
mitigating circumstances, I kind of need to hear from the defendant; that's the only
way I can make that decision.


 Other jurors say, that's not a problem for me; I can follow the law and base it on the
testimony and the evidence I hear.

 

 Can you do that?


 A. I can.


 On this record, no "clear abuse of discretion is evident" in the trial court's denial of
appellant's challenge for cause to Garfield. See Colburn, 966 S.W.2d at 517. Point of error sixteen
is overruled.

 Since appellant received two extra peremptory challenges, appellant must show that the trial
court erroneously denied at least three of his challenges for cause to the other veniremembers
identified in points six through fifteen. See Newbury, 135 S.W.3d at 31; Chambers v. State, 866
S.W.2d 9, 23 (Tex.Cr.App. 1993). This would satisfy the required showing for harm by
demonstrating that appellant was wrongfully deprived of at least one of his statutory peremptory
challenges. See Newbury, 135 S.W.3d at 31.

 In point of error six, appellant claims that veniremember Vanlokeren was challengeable for
cause because "he had a strong bias in favor of law enforcement and would want the defendant to
testify." The record reflects that appellant did not challenge Vanlokeren on the latter basis of
wanting appellant to testify, so we do not consider this claim. The record further reflects that
Vanlokeren, whose father was a police officer, stated on voir dire that this would not prevent him
from being able to "follow the law" as it had been explained during voir dire or prevent him "from
looking at things objectively." Appellant even stated in making his challenge for cause that
Vanlokeren "vacillated back and forth."

 [DEFENSE]: Yeah. You said challenge.


 Judge, I would challenge [Vanlokeren] based on the bias he's expressed and the-the
way he's kind of vacillated back and forth with that as to-as to being able to hold the
State to its burden [on the future-dangerousness special issue], proving beyond a
reasonable doubt in the punishment phase.


 [THE COURT]: Briefly, Ms. Scanlon, do you want to respond to that?


 [STATE]: Your Honor, I believe that [Vanlokeren] was unequivocal in saying that
he could follow the law as given. After multiple times of being asked by Mr.
Harrison, he still stated that he would follow the law; he would put those biases aside
and decide the facts of the case based on the evidence presented.


 [THE COURT]: All right.


 Mr. Harrison, I'm going to deny your challenge. I watched the juror and heard his
answers, of course. He's a very thoughtful person. And the record won't necessarily
reflect; he paused before he answered-well, the record may reflect since I've said it
now-before he responded to some of your questions.


 And I conclude on totality of his answers that he would be able to follow this law and
discharge his oath as a juror, so I'll deny your challenge.

 

 The trial court was in the best position to determine whether Vanlokeren was challengeable
for cause. On this record, no "clear abuse of discretion is evident." See Colburn, 966 S.W.2d at 517.

 In point of error seven, appellant claims that veniremember Janszen was challengeable for
cause because she was "predisposed to automatically answering 'yes' to [the future-dangerousness
special issue] if someone was convicted of murder" and because she "wanted to hear from the
defense why the defendant should not get the death penalty." The record reflects that appellant did
not challenge Janszen on the latter basis of wanting to hear from the defense on why appellant should
not get the death penalty, so we do not consider this claim.

 The record reflects that Janszen initially stated to the defense that she would answer "yes"
to the future-dangerousness issue if the only evidence presented was an intentional killing during a
robbery. She later stated that there "would be some cases of capital murder where [she] would say
yes to the [future-dangerousness special issue], and there would be some that [she] would say no." 
She later stated that she thought that she could keep an open mind and require the State to prove the
future-dangerousness special issue.

 Appellant challenged Janszen for cause on the basis that she was "predisposed" to answering
the future-dangerousness issue "yes" after convicting someone of capital murder. The trial court
denied the challenge.

 [DEFENSE]: Your Honor, the defense would challenge [Janszen] based on the
answer she gave to [the future-dangerousness special issue].


 I think she gave some honest answers and feeling that she was predisposed to find
somebody a continuing threat if they were guilty of capital murder.


 The law was explained to her a number of times. The first item of couples [sic] of
times she stuck with her answer, and I feel like that that's her honest feeling; that if
somebody had been found guilty of capital murder, that she was predisposed to
answer that yes and not require the State to meet the burden of proof on that issue.


 So we challenge her-challenge [Janszen] on that.


 [THE COURT]: Ms. Leyko, do you just want to respond-I don't want to bring her
back in to do it, but-


 [STATE]: Your Honor, no. I believe she said she could be fair. The only time she
said she would answer [the future-dangerousness special issue] yes is when she
thought she had a specific set of facts. And that was actually pinning her, and
probably in violation of Standefer.


 But when given a different scenario, she said no. And when asked specifically, are
you predisposed, she said she could be fair. She'd make us prove the case-prove that
question to her beyond a reasonable doubt.


 And when Mr. Harrison would back off the specific fact scenario and just say, are
there some capital murders that would be yes and some no, she said yeah. I mean,
to her it depends on the facts, and she understands it's our burden, and she said she
could follow the law.


 [THE COURT]: Mr. Harrison, I'll deny your challenge. I think she's qualified.


 The trial court was in the best position to determine whether Janszen was challengeable for
cause. On this record, no "clear abuse of discretion is evident." See Colburn, 966 S.W.2d at 517.

 In point of error eight, appellant claims that veniremember Gilbert was challengeable for
cause because she, too, "had predetermined that if a person was convicted of capital murder, she
would automatically answer 'yes' to [the future-dangerousness special issue]." The record, however,
reflects that Gilbert vacillated. For example, during questioning by the defense, she stated that she'd
be "leaning toward finding them dangerous" after a conviction for capital murder.

 Q. [DEFENSE]: Honestly, you told me that, honestly, you felt like you'd be leaning
toward somebody being found dangerous once they'd been convicted of capital
murder.


 A. [GILBERT]: Yes, I do.


 Q. And you indicated-the law says you can't do that, but you're telling me that, even
though you know you're supposed to start it out as no, and make the State prove, yes,
they are a continuing threat, being honest with me and being true to your oath, you'd
already be leaning toward finding the person dangerous. And you wouldn't start it
out as a no.


 A. This is all so new to me.


 Q. Oh, sure.


 A. And I know I probably have contradicted myself a thousand times already, but,
um-


 Q. Well, but it's like you said. I need your honest answer. I mean, if you honestly
feel that way, and that's how you feel, that's fine. We have plenty of people feel that
way, too. They say, hey, look, Rick, if somebody's already been found guilty of
capital murder, and there's no excuse given, and they specifically intended to kill
somebody, you know, being honest with you, I know the law says I'm supposed to
start that question out no and make the State prove it to me beyond a reasonable
doubt; but being honest with you, and the way I honestly feel, I wouldn't be able to
start it out as no; I'd be leaning toward finding them dangerous; and you know, you
almost have to prove to me that they weren't.


 A. Right. I agree that way.


 Q. Is that how you honestly feel?


 A. Yes.


 When subsequently questioned by the State, Gilbert stated, however, that she could "set [her]
biases aside, follow the law, and presume [the future-dangerousness special issue] no until [the State]
prove[d] it to [her] beyond a reasonable doubt."

 Q. [STATE]: Ms. Gilbert, not to continue to harp on this same issue; I just want to
kind of clarify and make sure we understand you completely.


 You indicated that you had a predisposition or a leaning toward-on [the future-dangerousness special issue], a leaning toward, yes, you'd find him to be a future
danger.


 We all have predispositions; we all have beliefs; we all-as much as we like to think
we're unbiased and neutral, we all have our leanings. We're just designed that way.


 We don't like murderers; we don't like child molesters. We're built that way.


 To be fair, and to be qualified to be on a jury, what you have to be able to do is set
those leanings, those biases, aside and follow the law.


 A. [GILBERT]: Exactly.


 Q. With regard to [the future-dangerousness special issue], though you have a leaning
toward, yeah, I would find him to be a future danger, understanding we have the
burden on that question-and what that means is, that question is presumed to be
no.-can you set your biases aside, follow the law, and presume that question no until
we prove it to you beyond a reasonable doubt?


 A. Yes. I could do that.


 Q. And so even though they've asked you your leaning, your predisposition, and
knowing that's your true feeling, you could wipe that, start out with a clean slate,
you're presuming this question no, until we've proven it to you beyond a reasonable
doubt.


 A. Yes. I could do that.


 The trial court did not abuse its discretion to deny appellant's challenge for cause to Gilbert
based on her conflicting answers. See Colburn, 966 S.W.2d at 517. On this record, no "clear abuse
of discretion is evident." See id.

 In point of error nine, appellant claims that veniremember Wilson was challengeable for
cause because he, too, was "predetermined that if a person was convicted of capital murder, he
would automatically answer 'yes' to [the future-dangerousness special issue]" and because he would
require the defense "to prove the issue of mitigation." The record reflects that appellant did not
challenge Wilson on the former basis that he would automatically answer "yes" to the future-dangerousness special issue when a defendant has been convicted of capital murder, so we do not
consider this claim. And, Wilson was not challengeable for cause "simply because he would place
the burden of proof on mitigation on the defense." See Ladd, 3 S.W.3d at 559. Wilson also testified
that, if the evidence from whatever source showed mitigation, he would consider it in answering the
mitigation special issue.

 Q. [DEFENSE]: Well, I understand that. But in-and sometimes that's what happens. 
Sometimes-like Ms. Scanlon says, all the defense-all the defendant has to do is show
up, and we show up with him. And a lot of times in a case the defense doesn't do
anything but show up.


 And in-in a situation like this, in answer to [the mitigation special issue], I take it
that you would really want the defense to do something in order for you to answer-


 A. [WILSON]: I would want evidence, you know.


 Q. From the defense.


 A. From everybody. Yes. I'd want to be able to understand what the whole situation
was.


 I mean, if you don't present a defense, it's hard to agree one way or the other.


 Q. If the defense did not present any evidence to you, any evidence to you, would you
just close off any deliberation on mitigation altogether and not look for it anywhere
else that it may come up?


 Because it can be anywhere.


 A. It can be anywhere. I would look for whatever the possibilities are.


 I would prefer it came from the defense; that would be my preference. But I have to
look at the evidence, and, if the evidence showed something along that nature, then
I would have to look at that and examine it and proceed on it accordingly.


 The trial court was in the best position to determine whether Wilson was challengeable for
cause. On this record, no "clear abuse of discretion is evident." See Colburn, 966 S.W.2d at 517.

 In point of error ten, appellant claims that veniremember Kunesh was challengeable for cause
because "she could not consider a number of mitigating circumstances." Kunesh stated that what
she defined "as mitigating or extenuating has to meet an extraordinarily high bar before we say that
it indeed is what we're going to use as a safety net to back off on the death penalty." There "is no
per se evidence that must be viewed by a juror as having definitive mitigating effect." See
McFarland v. State, 928 S.W.2d 482, 497-98 (Tex.Cr.App. 1996). The trial court, therefore, did not
abuse its discretion to deny appellant's challenge for cause to Kunesh.

 In point of error eleven, appellant claims that veniremember Powers was challengeable for
cause because "she had predetermined that if a person was convicted of capital murder, she would
automatically answer 'yes' to [the future-dangerousness special issue], she could not consider
alcohol or drug use as mitigating circumstances and she would place a burden on the defense to
prove mitigation." The record reflects that Powers vacillated on whether she would automatically
answer "yes" to the future-dangerousness special issue after a capital murder conviction. She
ultimately stated that she could presume a "no" answer and wait for the State to prove it.

 Q. [DEFENSE]: Okay. So let's try it one more time.


 The law says you've got to presume [the future-dangerousness special issue] to be,
no, he's not a continuing threat, and the State has to prove it to you.


 Now, I asked you, and you and some other jurors feel like sometimes that, even
though that's what the law is, I'd have a problem presuming that to be no, and I
would presume that to be yes. That's the way I'm-even though the law says I'm
supposed to presume it no, being honest with you, if he's already been convicted of
capital murder, I'm going to probably be presuming that to be yes.


 And, I'm asking you, do you have that same problem, or not?


 A. [POWERS]: My-my first thought would be yes.


 Q. Right.


 A. Now, I have to wait for the State to give me the evidence to prove to me that they
are a future danger to society.


 Q. Right. So the question becomes-


 A. I will look at the evidence before I make a final decision.


 Q. Okay. And that's great. But the question still that we need to know is, can you
presume [the future-dangerousness special issue] to be no, even though somebody's
been convicted of capital murder?


 A. Yes.


 Q. Okay. So everything you said earlier, were you just confused with what I was
saying?


 A. Yes.

 

 And, there is no per se evidence that Powers was required to view as having definitive
mitigating effect. See McFarland, 928 S.W.2d at 497-98. Powers also was not challengeable
"simply because [s]he would place the burden of proof on mitigation on the defense." See Ladd, 3
S.W.3d at 559. Powers also ultimately stated that she could consider a life sentence even if the
defense did not present "anything" to her.

 Q. [DEFENSE]: Okay. So you would feel the defense would have to bring you
something-


 A. [POWERS]: Yeah.


 Q. -to warrant a life sentence versus a death sentence with a [sic] mitigating
circumstances.


 A. Yes.


 Q. Okay. And if the defense didn't bring that to you, or that wasn't brought, that
might be a problem for you in considering a life sentence.


 A. No. It wouldn't be a problem if it-if you're not presenting anything to me-


 Q. Right.


 A. -it's not going to be a problem.

 

 The trial court was in the best position to determine whether Powers' was challengeable for
cause. On this record, no "clear abuse of discretion is evident." See Colburn, 966 S.W.2d at 517.

 In point of error twelve, appellant claims that veniremember Kleber was challengeable for
cause apparently because he would not consider as mitigating "drug use, alcohol use, some of those
things; anything that you do on your own that you've made a decision on your own to use." Kleber
was not required to consider these things to be mitigating. See McFarland, 928 S.W.2d at 497-98. 
The trial court, therefore, did not abuse its discretion to deny appellant's challenge for cause to
Kleber.

 In point of error thirteen, appellant claims that veniremember Gaus was challengeable for
cause because "he would give the death penalty to someone who was convicted of capital murder
and had found [the future-dangerousness special issue] to be yes." Appellant challenged Gaus for
cause on the basis that he "would not be really interested in moving on down to [the mitigation
special issue] and considering mitigation" after answering "yes" to the future-dangerousness special
issue.

 Gaus stated, during questioning by the State, that he thought the mitigation special issue was
necessary and that he would be "able to listen to all the evidence and weigh it accordingly."

 Q. [STATE]: -what was your impression, or what do you think of this [mitigation
special issue]? What do you take it to be?


 A. [GAUS]: (No audible response)


 Q. Nothing.


 A. (No audible response)


 Q. Nothing?


 A. It's just-it-the way I understand it, and my take on it, would be that there's
something-evidence or special circumstances involved here whereas the murder
would not-or the death sentence would not be justified.


 Q. And that's exactly-that's exactly it. The legislature created this vehicle or this
question as a vehicle, as a chance, if you will, to take a step back; that a defendant
has been found guilty beyond a reasonable doubt of capital murder, has been proven
to you beyond a reasonable doubt to be a probable continuing threat to society;
regardless of those two factors, is there anything that you've heard, any evidence, that
is sufficiently mitigating to warrant life rather than death.


 A. Mm-hmm.


 Q. What do you think about that? Do you think that's a good thing? Bad thing?


 A. I think it's necessary.


 Q. Okay. Since we're dealing with someone's life?


 A. Sure.


 Q. Okay.


 Mitigating evidence is not going to be defined for you. It's going to be whatever you
think it is.


 To be qualified as a juror, we just need you to have an open mind and not
automatically exclude a piece of evidence just because of the nature of the evidence. 
For instance, saying, I won't consider someone's background, because I know people
that came from a poor or abusive background, and they don't kill people.


 Do you think you'd be qualified as a juror; able to listen to all the evidence and
weigh it accordingly?


 A. Yes.


 Gaus later stated, during questioning by the defense, that "[t]here's a very good chance he'd
go with the death penalty" after a "yes" answer to the future-dangerousness special issue and that
there were "probably very few things" that he would consider "as mitigating factors." On this
record, the trial court would not have abused its discretion to find that Gaus never expressed a
categorical refusal to consider the mitigation special issue after a "yes" answer to the future-dangerousness special issue. See Colburn, 966 S.W.2d at 517.

 Based on the foregoing, we conclude that the trial court did not erroneously deny appellant's
challenges for cause to Vanlokeren (point six), Janszen (point seven), Gilbert (point eight), Wilson
(point nine), Kunesh (point ten), Powers (point eleven), Kleber (point twelve), and Gaus (point
thirteen). Since appellant has to show that the trial court erroneously denied his challenges for cause
to at least three of the veniremembers identified in points six through fifteen, it is unnecessary to
decide whether the trial court erroneously denied his challenges for cause to Farris (point fourteen)
and Baird (point fifteen). See Newbury, 135 S.W.3d at 41. Points of error six through fifteen are
overruled.

 In point of error eighteen, appellant claims that the evidence is legally insufficient to support
the jury's finding that there is a probability that appellant would commit criminal acts of violence
that would constitute a continuing threat to society. We apply the Jackson v. Virginia standard in
determining whether the evidence is sufficient to support this finding. See Allridge v. State, 850
S.W.2d 471, 487 (Tex.Cr.App. 1991) (appellate court views the evidence in the light most favorable
to the verdict to determine whether any rational trier of fact could have believed beyond a reasonable
doubt that the defendant would probably commit criminal acts of violence that would constitute a
continuing threat to society).

 The evidence shows that appellant and an accomplice (Chavez) forced the victim into the
victim's car in the parking lot of a grocery store. Appellant and Chavez took the victim in his own
car to a remote location and parked. Appellant led the victim into some woods while Chavez waited
at the car. Appellant shot the victim five times with the last shot to the head at close range to make
sure the victim was dead. Appellant was confrontational when the police arrested him about an hour
later. That evening, several police officers observed that appellant was unremorseful and that his
situation seemed like "a joke to him." One officer told appellant several times that he should take
his situation seriously and stop laughing. Appellant was involved in an attempted armed robbery
about five days before the victim's murder. Appellant engaged in numerous acts of misconduct
while incarcerated on death row. We decide that the evidence is sufficient to support the jury's
finding on the future-dangerousness special issue. Point of error eighteen is overruled.

 In point of error seventeen, appellant claims that the trial court erred in not allowing him to
present, as constitutionally relevant mitigating evidence, evidence that Chavez received a life
sentence for his lesser role in the victim's murder. This Court has held that "evidence of a co-defendant's conviction and punishment is not included among the mitigating circumstances which
a defendant has a right to present" in part because this evidence does not relate to the defendant's
"own circumstances." See Morris v. State, 940 S.W.2d 610, 613-14 (Tex.Cr.App. 1996).

 Appellant claims that more recent United States Supreme Court cases such as Tennard v.
Dretke, 542 U.S. 274 (2004), have "impliedly overrule[d] any prior rule of Texas evidence that
would normally prevent the use of this type of evidence at a punishment hearing because of the
special nature of a capital murder death case." We disagree, because, even though cases such as
Tennard establish a "low threshold for [constitutional] relevance," these cases still require that the
proffered evidence relate to the defendant's "own circumstances." See Tennard, 542 U.S. at 284-85
(placing virtually no limits on evidence that a capital defendant may introduce "concerning his own
circumstances"). Point of error seventeen is overruled.

 In point of error nineteen, appellant claims that "the trial court erred in not concluding the
punishment hearing and imposing a life sentence based on the trial court being made aware of the
issues supporting the reversal of the recent death penalty case of Smith v. State, 543 U.S. 37 (2004)." 
Appellant claims that the statutory mitigation special issue set out in the version of Article 37.071,
Tex. Code Crim. Proc., applicable to appellant's case "is nothing more than a nullification issue
to [the future dangerousness special issue]."

 The Supreme Court's decision in Smith addressed the constitutionality of a non-statutory,
"nullification" special issue that effectively instructed the jury to compromise its ethics and disregard
its oath and instructions by changing one of its "yes" answers to one of the other statutory special
issues to a "no" answer if the jury believed that mitigating circumstances existed warranting a
sentence less than death. See Smith, 543 U.S. at 38-39, 45-49. The statutory mitigation special issue
submitted in this case is nothing like the "nullification" instruction at issue in Smith. The statutory
mitigation special issue in this case provided appellant's jury a vehicle to "fully" consider and give
effect to appellant's mitigating evidence without requiring the jury to disregard its oath and
instructions by changing its answer to the future-dangerousness special issue. Unlike Smith, the jury
in this case could have "fully" considered and given effect to appellant's mitigating evidence by
providing a "yes" answer to the mitigation special issue. Point of error nineteen is overruled.

 In point of error twenty, appellant claims that the trial court erroneously admitted "numerous
autopsy photographs in violation of [Tex. R. Evid. 403], where the prejudicial effect of the evidence
far outweighed any probative value." (19) Appellant claimed at trial that the "inflammatory and
prejudicial value outweigh[ed] the probative value" of the photographs. (20) The trial court overruled
appellant's objection finding "that the probative value of the particular exhibits outweighs the
prejudicial value, given the nature of this case and the evidence." The record reflects that the
medical examiner used the autopsy photographs to help explain his testimony about the victim's five
gunshot wounds. For example,

 Q. [STATE]: State's Exhibit No. 57, what is this a photograph of?


 A. [MEDICAL EXAMINER]: Well, this is the entry site behind [the victim's] left
ear.


 Now, this is a photograph that is dirty, or not cleaned up. I haven't shaved away the
hair so you can better see the entry, and haven't cleaned up any blood. This is as it
is uncleaned.

* * *

 Q. Dr. Rohr, looking at State's Exhibit No. 50, what are we looking at here?


 A. Well, this is a cleaned-up photograph of the entry site behind the left ear. Here
I have the hair shaved away, and I've cleaned away a lot of the blood, and you can
easily see the entry wound.


 One of the things I'd like to point out is that there's characteristics of a contact
wound here, and that there's splitting of the wound here, a long laceration; and if you
look a little harder, the edges are serrated, or jagged, right up in here, which is-it's
not a smooth round defect like you'd expect in a distant shot. Only a contact wound
against a flat bone would create this sort of a situation.


 Appellant's claim on appeal boils down to the argument that it was "unfairly prejudicial" for
the jury to see the autopsy photographs that helped explain the medical examiner's testimony and
that depicted the victim's gun shot wounds inflicted by appellant because this evidence was "meant
to appeal to emotion rather than the fact finding process." The case law, however, actually refers
to an "undue tendency" to suggest decision on an "improper basis" such as an "emotional one." See
Newbury, 135 S.W.3d at 43. The photographs in this case depict what appellant caused and what
verbal testimony properly described. (21) See id. Under these circumstances, the trial court would not
have abused its discretion to determine that any tendency of the photographs to suggest a decision
on an emotional basis was not "undue" or that any "undue tendency" to suggest decision on an
emotional basis did not "substantially outweigh" or even "outweigh" the probative value of the
photographs. See id.; see also Escamilla v. State, 143 S.W.3d 814, 826 (Tex.Cr.App. 2004), cert.
denied, 544 U.S. 950 (2005) (trial court did not abuse its discretion to admit autopsy photographs
because they helped explain the medical testimony describing the victim's various injuries caused
by the defendant). Point of error twenty is overruled.

 In point of error twenty-one, appellant asserts that "the trial court erred in overruling
appellant's objection to oral statements made by the defendant while he was in custody." The record
reflects that the State intended to elicit testimony from officer Giddings concerning his observations
of appellant's demeanor during the booking process after his arrest. (22) Appellant generally objected
"to anything [appellant] said while he was in custody." The trial court ruled that Giddings could not
offer an opinion of what appellant's "mental processes might have been" but that he could describe
for the jury "what he saw [appellant] do, whatever that was; smiling, not smiling, or casual or
uncasual, or whatever." We understand appellant to complain on appeal that Giddings also testified
before the jury that appellant did not "seem to express any remorse for what he had done."

 Q. [STATE]: How would you describe the defendant's demeanor while y'all were
doing the book-in process and removing his clothes?


 A. [GIDDINGS]: Nice. He was not unhappy. He seemed to be nonchalant about the
whole thing.


 At times he would laugh; and during-during the book-in process, he-he would laugh
and cut up and just seemed like everything was fine.


 Q. At the time you were dealing with him, did he seem to express any remorse for
what he had done?


 A. None whatsoever.

 

 Assuming that this lack of expression of remorse testimony constituted an opinion of what
appellant's "mental processes might have been," appellant failed to preserve any error in the
admission of this testimony because he did not object to this foreseeable event or move for an
instruction to disregard it, if it was not foreseeable. See Young v. State, 137 S.W.3d 65, 69-70
(Tex.Cr.App. 2004) (objection required to preserve error to any foreseeable occurrence, and request
for instruction to disregard or motion for mistrial required to preserve error to unforeseeable
occurrence). In addition, any error in admitting this lack of expression of remorse evidence was
harmless because other evidence of appellant's lack of expression of remorse was admitted without
objection from appellant. See Leday v. State, 983 S.W.2d 713, 717-18 (Tex.Cr.App. 1998). For
example, Detective Bennett testified, without objection, that she observed appellant on the night of
his arrest "laughing, smirking, smiling," which Detective Bennett interpreted as appellant having "no
remorse whatsoever." (23) Point of error twenty-one is overruled.

 In point of error twenty-two, appellant again asserts that "the trial court erred in overruling
appellant's objection to oral statements made by the defendant while he was in custody." Appellant
claims that, "after counsel made an objection to all evidence involving statements by the defendant
while in custody," the trial court erroneously permitted officer Pero to testify that appellant never
expressed any remorse. Appellant's brief contains no citation to the record where this objection was
made. And, the record citation provided in appellant's brief indicates that no such objection was
ever made to Pero's testimony. (24)

 Q. [STATE]: And were you assigned at some point to watch [appellant] while he was
in jail?


 A. [PERO]: Yes. In the interview room in the police station.


 Q. And what were your duties regarding [appellant] that evening?


 A. I was basically stationed outside of the interview room, and-which is off one of
the hallways. I was instructed to make sure no person, officer or otherwise, had any
conversations in that general vicinity so no one-so [appellant] couldn't hear what we
were talking about; and also to watch over him, guard the room; and I also facilitated
several of his requests he made to me; things such as a trip to the restroom, water,
food. I think he may have requested a blanket, at one point.


 Q. And did he ever make those-did he make those requests in English, or in Spanish?


 A. In English.


 Q. And at the time that he was requesting things from you, what was his demeanor?


 A. He was very-the word I use to describe it is very amused with the situation he was
in. On several occasions he chuckled or laughed; just-


 Q. Did it seem unusual, given his circumstances?


 A. Yes. I was surprised by his demeanor.


 Q. At any point did he give you a hand gesture that is sometimes determined-deemed
to be offensive?


 A. On one of the times where I opened the door to the interview room to check on
[appellant], he flipped me off and chuckled as I exited.


 Q. And was-what events led up to that?


 A. Simply that; simply me opening the door to check on him, as I did periodically. 
There was no words spoken, just the gesture and the chuckle.


 Q. And did you respond?


 A. I did not.


 Q. During the time that you were dealing with [appellant] and interacting with him,
did you ever see him express any remorse for the reason he was in there.


 A. No.

 

 Appellant did not preserve any error because he failed to properly object to this testimony. 
Point of error twenty-two is overruled.

 In point of error twenty-three, appellant again complains that "the trial court erred in
overruling appellant's objection to oral statements made by [appellant] while he was in custody." 
In point of error twenty-four, appellant complains that "the trial court erred when it permitted the
State to present testimony of a confession by [appellant] to prior murders as a prior bad act, since
the State failed to name the alleged victim of the crime, or indicate when or where it occurred, and
left the defendant with too little time and information to respond."

 The record reflects that, as appellant was being transported back to the court house from jail
after a lunch break during the punishment hearing, appellant spontaneously told a county detention
officer (Poindexter) that he had "killed three people in Oak Cliff." Appellant objected to the
admission of this evidence on hearsay grounds. The State responded that it was a "party opponent
admission" and not hearsay. The trial court overruled appellant's objection. Poindexter provided
the following testimony before the jury.

 Q. [STATE]: Now, on your way over back to the courtroom after lunch today, did
you have a conversation with [appellant]?


 A. [POINDEXTER]: Yes, ma'am.


 Q. And what was the nature of that conversation?


 A. I was asking him from where about in Argentina he was, as we were walking
through the tunnel.


 Q. And during the course of this conversation, did the-did [appellant] make any
statements that alarmed you?


 A. Yes, ma'am. He stated kind of in a-we were talking about Argentina, and then
there was a pause, and out of nowhere he just kind of turned and looked at me and
said, You know I killed three people in Oak Cliff.


 We decide that the trial court did not abuse its discretion to admit this evidence. The trial
court would not have abused its discretion to decide that the very fact that appellant would make
such a statement (without regard to its truthfulness) in the course of his capital-sentencing
proceeding would have some relevance to both special issues. (25) Points of error twenty-three and
twenty-four are overruled.

 In points of error twenty-five through forty-nine, appellant presents various challenges to the
court's jury charge. In point of error twenty-five, appellant claims that "the trial court erred in failing
to provide a rational process for the jury to determine life or death." In point of error twenty-six,
appellant claims that "the trial court erred in failing to instruct the jury how to rationally resolve the
tension between the requirement of an individualized sentencing procedure and the provision of a
mechanism to deter others from committing similar crimes." In point of error twenty-seven,
appellant claims that "the punishment charge as a whole is legally insufficient." In point of error
twenty-eight, appellant claims that the "punishment charge as a whole is legally insufficient because
it fails to provide a rational process to permit a discretionary grant of mercy based on mitigating
circumstances." In point of error twenty-nine, appellant claims that "the punishment charge as a
whole fails to provide a rational process to permit a discretionary grant of mercy based on mitigating 
circumstances." In point of error thirty, appellant claims that "the trial court erred in failing to
instruct the jury that they may consider 'non-Penry' mitigating evidence to rebut, and raise a
reasonable doubt about, the State's claim of future dangerousness, deliberation and reasonable
expectation of death, as well as in consideration of [the mitigation special issue] on mitigating
circumstances."

 In point of error thirty-one, appellant claims that "the trial court erred in failing to instruct
the jury that there is no presumption in favor of death." (Emphasis in original). In point of error
thirty-two, appellant claims that "the trial court erred in failing to instruct the jury on the meaning
of the phrase 'criminal acts of violence.'" In point of error thirty-three, appellant claims that "the trial
court erred in failing to instruct the jury that 'continuing threat to society' does not mean 'any threat
of harm or death, no matter how minor or remote." In point of error thirty-four, appellant claims that
"the trial court erred in failing to submit a definitional instruction to the jury to define continuing
threat to society so as to select only the 'worst of the worst' for the death penalty." In point of error
thirty-five, appellant claims that "the punishment charge as a whole is legally insufficient."

 In point of error thirty-six, appellant claims that "the trial court erred in failing to limit the
jury's consideration of victim impact evidence." In point of error thirty-seven, appellant claims that
"the trial court erred in failing to instruct the jury that victim character or impact evidence does not
meet or relieve the State of its burden to prove the continuing threat issue beyond a reasonable
doubt." In point of error thirty-eight, appellant claims that "the trial court erred in failing to instruct
the jury that jurors are not to use the victim evidence to make any comparative worth analysis
contrary to the holding in [citation omitted]."

 In point of error thirty-nine, appellant claims that "the trial court erred in failing to instruct
the jury that it shall answer 'yes' to [the future-dangerousness special issue] if 10 jurors agree that
one or more mitigating circumstances exist." (26) In point of error forty, appellant claims that "the trial
court erred in failing to instruct the jury that even if they disagree as to which mitigating
circumstance or circumstances is or are sufficient, a sentence of life imprisonment rather than death
be imposed." In point of error forty-one, appellant claims that "the trial court erred in failing to
instruct the jury that it shall answer 'yes' to [the mitigation special issue] even if the jurors disagree
as to which mitigating circumstance or circumstances is or are sufficient to warrant that a sentence
of life imprisonment rather than death be imposed." (Emphasis in original). In point of error forty-two, appellant claims that "the trial court erred in failing to instruct the jury that it may answer 'yes'
to [the mitigation special issue] even if the jurors disagree as to which mitigating circumstance or
circumstances is or are sufficient to warrant that a sentence of life imprisonment rather than death
be imposed." In point of error forty-three, appellant claims that "the trial court failed to inform the
jury of all their options provided by law, which renders the capital sentencing process irrational and
unreliable under the Eighth and Fourteenth Amendments."

 In point of error forty-four, appellant claims that "the trial court erred in failing to inform the
jury that if they do not unanimously agree on special issues one through two, that has the same
dignity and respect as a 'yes' or 'no' answer and is the same in legal effect as a 'no' answer." In
point of error forty-five, appellant claims that "the trial court erred in failing to inform the jury that
a life sentence, not a mistrial, results from a failure to answer the special issues." In point of error
forty-six, appellant claims that "the jury instruction which instructs the jury that 10 of them must
agree in order to answer [the future-dangerousness special issue] with a 'no' answer which will result
in a life sentence is a misrepresentation."

 In point of error forty-seven, appellant claims that "the trial court erred in instructing the jury
to decide any issue of fact that was not alleged in the indictment returned against the defendant." (27) 
In point of error forty-eight, appellant claims that "the trial court erred in failing to instruct the jury
in [the mitigation special issue] that the State has the burden to prove beyond a reasonable doubt that
no circumstances exists that would justify a sentence of life." And, in point of error forty-nine,
appellant claims that "the trial court erred in failing to require proof of extraneous offenses and other
misconduct beyond a reasonable doubt." (Emphasis in original). (28)

 The record reflects that appellant made various objections to the court's charge. These
objections seem consistent with the points of error raised on appeal. Appellant argues in his brief:

 These [trial] objections were made to either bring about a reality of truth in jury
charges, especially in death cases, or to implement recommendations of the American
Bar Association's position as published by its Section of Individual Rights and
Responsibilities "Death Without Justice: A Guideline for Examining the
Administration of the Death Penalty in the United States," published June, 2001 and
included in the publication of the State Bar of Texas "Capital Punishment: A Review
of Recent Developments and Their Implications," February 8, 2006.


 We believe it sufficient to dispose of these points (29) by recognizing that the trial court
submitted a charge consistent with applicable state statutes, which have withstood numerous
constitutional challenges. These state statutory provisions meet federal constitutional requirements
by narrowing the class of "death-eligible defendants" and they arguably provide more than required
by the federal constitution by providing a jury a vehicle to "fully" consider mitigating evidence "in
every conceivable manner in which the evidence might be relevant." See Cockrell v. State, 933
S.W.2d 73, 92-93 (Tex.Cr.App. 1996). Points of error twenty-five through forty-nine are overruled.

 In points of error fifty through sixty-six, appellant raises various constitutional challenges
to Texas' death penalty statutes. In point of error fifty, appellant claims that various Texas capital
murder statutory provisions were improperly applied to appellant "because the State of Texas has
not developed appropriate ways to enforce the constitutional restriction against execution of mentally
retarded offenders upon its execution of death sentences." In point of error fifty-one, appellant
claims that "the statute under which [he] was sentenced to death is unconstitutional in violation of
the cruel and unusual punishment prohibition of the Eighth Amendment because it allows the jury
too much discretion to determine who should live and who should die and because it lacks the
minimal standards and guidance necessary for the jury to avoid the arbitrary and capricious
imposition of the death penalty."

 In point of error fifty-two, appellant claims that "the statute under which [he] was sentenced
to death" violates the Eighth Amendment "because the mitigation special issue sends mixed signals
to the jury thereby rendering any verdict reached in response to that special issue intolerable and
unreliable." In point of error fifty-three, appellant claims that "the statute under which [he] was
sentenced to death" violates the due process "because it implicitly puts the burden of proving the
mitigation special issue on appellant rather than requiring a jury finding against appellant on that
issue under the beyond a reasonable doubt standard."

 In point of error fifty-four, appellant claims that "the trial court erred in denying appellant's
motion to hold Article 37.071 Sec. 2(E) and (F) concerning burden of proof unconstitutional as a
violation of Article One Sec. 10 and Sec. 13 of the Texas Constitution." In point of error fifty-five,
appellant claims that the "Texas death penalty scheme violates due process protections of the United
States Constitution because the punishment special issue related to mitigation fails to require the
State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary
to [Apprendi v. New Jersey, 530 U.S. 466 (2000)] and its progeny."

 In point of error fifty-six, appellant claims that the "Texas death penalty scheme violated
appellant's rights against cruel and unusual punishment and due process of law under the Eighth and
Fourteenth Amendments to the United States Constitution by requiring as least ten 'no' votes for the
jury to return a negative answer to the punishment special issues." In point of error fifty-seven,
appellant claims that the "Texas death penalty scheme violated appellant's rights against cruel and
unusual punishment, an impartial jury and to due process of law under the Sixth, Eighth and
Fourteenth Amendments of the United States Constitution because of vague, undefined terms in the
jury instructions at the punishment phase of the trial that effectively determine the difference
between a life sentence and the imposition of the death penalty."

 In point of error fifty-eight, appellant claims that the "Texas death penalty scheme denied
appellant due process of law, and imposed cruel and unusual punishment in violation of the Fifth,
Eighth and Fourteenth Amendments of the United States Constitution because of the impossibility
of simultaneously restricting the jury's discretion to impose the death penalty while also allowing
the jury unlimited discretion to consider all evidence militating against the imposition of the death
penalty." In point of error fifty-nine, appellant also claims that this also "denied [him] due course
of law, and imposed cruel and unusual punishment, in violation of Article I, §§ 13 and 19, of the
Texas Constitution."

 In point of error sixty, appellant claims that "the trial court erred in overruling appellant's
motion to hold Art. 37.071 Sec. 2(e) and (f) unconstitutional because said statute fails to require the
issue of mitigation be considered by the jury." In point of error sixty-one, appellant claims that the
mitigation special issue is "unconstitutional because it fails to place the burden of proof on the State
regarding aggravating evidence."

 In point of error sixty-two, appellant claims that the mitigation special issue is
"unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution
because it permits the very type of open-ended discretion condemned by the United States Supreme
Court in [Furman v. Georgia, 408 U.S. 238 (1972)]." In point of error sixty-three, appellant claims
that "Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth
Amendments because it does not permit meaningful appellate review."

 In point of error sixty-four, appellant claims that the "trial court erred in overruling
appellant's second motion to set aside the indictment as being unconstitutional based on the
enumerated constitutional defects of the Texas capital murder death penalty law." In point of error
sixty-five, appellant claims that the "cumulative effect of the above-enumerated constitutional
violations denied appellant due process of law in violation of the Fifth and Fourteenth Amendments
of the United States Constitution." In point of error sixty-six, appellant claims that this also denied
him "due course of law under Article I, § 19, of the Texas Constitution." 

 In his brief, appellant asserts that:

 [These] Constitutional Issues have been previously submitted to this Honorable
Court; which previously has turned them down. Appellant submits these issues in
this case not to cause unnecessary litigation but to invite this Court to review any
prior stand on any issue and more importantly to preserve each issue for further
review in the Federal Court system, which has final constitutional power of review.


 We decline appellant's invitation to review our prior decisions on these issues. (30) Points of
error fifty through sixty-six are overruled.

 The judgment of the trial court is affirmed.


 Hervey, J.


Delivered: June 6, 2007

Publish
1. See generally Saldano v. State, 70 S.W.3d 873 (Tex.Cr.App. 2002); Saldano v. Dretke, 363
F.3d 545 (5th Cir. 2004).
2. Appellant's death-row misconduct includes assaulting and threatening to kill guards,
throwing urine and feces at guards, and setting fires. A death-row guard testified that appellant's
death-row misconduct was a "daily thing."
3. See Lagrone v. State, 942 S.W.2d 602, 609-612 (Tex.Cr.App. 1997) (defendant's
presentation of psychiatric testimony on future-dangerousness is a "limited" waiver of Fifth
Amendment rights entitling State to compel defendant to an examination by State's psychiatric
expert for rebuttal purposes "provided, however, that the rebuttal testimony is limited to the
issues raised by the defense expert") (emphasis supplied); Bradford v. State, 873 S.W.2d 15, 24-27
(Tex.Cr.App. 1993) (Campbell, J., dissenting) (same).
4. Point of error three states:


 The trial court committed constitutional error by effectively barring mitigation
testimony when it held that if [appellant] permitted a Lagrone examination by the
State in order to present its expert testimony on mitigation the State could use its
examination to present testimony on issues besides mitigation.
5. The record reflects that individual voir dire began on October 4, 2004. Appellant filed the
written motion on October 21, 2004. The hearing on this written motion occurred on November 5,
2004. Individual voir dire also concluded on November 5, 2004. The punishment hearing
commenced on November 10, 2004.
6. Appellant's October 21, 2004, motion was entitled:


 Motion That The Court Rule: A) That Texas Code Crim. Proc. Art. 37.071 § 2(b)(1)
Is Unconstitutionally Vague; B) That Texas Code Crim. Proc. Art. 37.071§ 2(b)(1)
May Not Be Constitutionally Applied Under The Facts Of The Present Case; And
Alternatively, Should The Statute Not Be Held Unconstitutional; C) In Limine To
Exclude All Evidence Of [Appellant's] Conduct Subsequent To His First Trial In
July 1996[.] 
7. The procedurally defaulted claim of prosecutorial misconduct at appellant's 1996 trial
involved a state expert's use of race as one of several factors upon which this expert concluded that
appellant is dangerous. This claim was procedurally defaulted because appellant did not object to
this testimony thereby not providing the trial court or the State with an opportunity to correct the
problem and remove the basis of objection. See Posey v. State, 966 S.W.2d 57, 62 (Tex.Cr.App.
1998).
8. Appellant attached to his written motion Peccora's affidavit detailing appellant's alleged
mental decline on death row.
9. Appellant's new written motion was entitled:


 Motion That The Court Rule On All Aspects Of Defendant's Motion Of October 21,
2004 After Ordering Examination Of The Defendant Solely For The Purpose Of The
Motion, And That The Court Order That The Hearing On The Motion Take Place
Either At A Time That Takes Into Account [Peccora's] Personal Needs Or Post-Trial[.]
10. See Luce, 469 U.S. at 40 n.2 (using term "in limine" to "refer to any motion, whether made
before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually
offered").
11. The State also claims that it "could be argued" that appellant did not preserve error "because
he did not call [Peccora] to testify and then object to the State's attempts to introduce its psychiatric
expert."
12. Applying these principles to cases like this would also discourage a defendant from pursuing
a strategy of "planting" reversible error in the record based on, for example, a ruling not to limit a
Lagrone examination to rebutting the testimony of a defense expert whose testimony the defendant
never even intended to present to the jury. See also Luce, 469 U.S. at 42 (requiring defendant to
testify in order to preserve claim that prior conviction could not be used for impeachment "will
enable the reviewing court to determine the impact any erroneous impeachment may have had in
light of the record as a whole; it will also tend to discourage making such motions solely to 'plant'
reversible error in the event of conviction").
13. For example, appellant requests this Court to reverse his death sentence based on speculation
that he actually would have presented Peccora's testimony and that a Lagrone examination would
have resulted in the presentation of evidence unfavorable to him on the future-dangerousness special
issue. It is also possible to speculate that a Lagrone examination might have revealed that
appellant's misconduct on death row is due to appellant being a dangerous sociopath and not to any
mental decline. It is possible to further speculate that this would have been relevant to rebut
Peccora's testimony (if appellant had decided to present it) about appellant's mental decline while
also showing appellant's future dangerousness. It is possible to even further speculate that the
possible admission of this evidence under these circumstances would probably have been harmless
depending on what else that we may speculate would have unfolded at appellant's trial. Of course,
all of this is "wholly speculative." See Luce, 469 U.S. at 41. 
14. The defendant in Lagrone also submitted to an examination by a state psychiatrist before
complaining on appeal that he was required to do so. See Lagrone, 942 S.W.2d at 609-10.
15. The record also reflects that appellant used a peremptory challenge to remove veniremember
Clampit after the trial court denied appellant's challenge for cause to Clampit. Appellant does not
claim on appeal that the trial court erroneously denied his challenge for cause to Clampit. 
16. See Long v. State 823 S.W.2d 259, 265 (Tex.Cr.App. 1991) (accepting a juror "under protest"
arguably made her an "objectionable juror").
17. In his brief, appellant asserts that Garfield's "inclusion on the jury was a violation of Article
37.071, of the Tex. Code Crim. Proc.," which, according to appellant, "mandates that mitigation
be considered in death penalty cases." There is case law stating that a conviction should be reversed
"when the accused challenged a venireman for cause on the basis that he could not be a fair and
impartial juror, the challenge was [erroneously] denied" and the venireman sat on the jury "because
the accused had no remaining peremptory challenges to prevent it." See Delrio v. State, 840 S.W.2d
443, 445 n. 3 (Tex.Cr.App. 1992); Johnson v. State, 43 S.W.3d 1, 12-14 (Tex.Cr.App. 2001)
(Hervey, J., dissenting).
18. This portion of the voir dire record seems to indicate that Garfield might have drawn some
adverse inference from appellant's failure to testify. Shortly thereafter, Garfield stated that "the
defendant not testifying would not play-would not play a role" in his decision.
19. In his brief, appellant claims that the trial court erroneously admitted State's Exhibits 50-52
and 54-60. The record, however, reflects that appellant did not object to the admission of State's
Exhibit 60. In addition, appellant did not include State's Exhibits 50-52 as part of the record on
appeal. These exhibits are, however, adequately described in the record and in the parties' briefs. 
20. Among other things, the State claimed:


 We're at the punishment phase. This jury didn't hear the guilt-innocence. We're
establishing cause of death; we're also establishing the defendant is a future danger
in that he wanted to make sure that this defendant [sic] was dead by shooting him
five times, as well as the contact wound to the head, and this is best illustrated by
showing these pictures to the jury.
21. See Ramirez v. State, 815 S.W.2d 636, 647 (Tex.Cr.App. 1991) (photographs generally
admissible if verbal testimony of matters depicted in them is also admissible). 
22. See Lane v. State, 933 S.W.2d 504, 507 (Tex.Cr.App. 1996) (opinion of police, derived from
their observations of a defendant, about that defendant's character and likelihood of future violence,
is some evidence of future-dangerousness).
23. See also Garcia v. State, 126 S.W.3d 921, 924-25 (Tex.Cr.App. 2004) (prosecutorial
comment concerning defendant's lack of remorse supported by police observations of in-custody
defendant as "cocky" and as "very nonchalant, very laid back and calm . . . There were several things
that had a tone of arrogance to it"). 
24. The record actually reflects that, during a hearing outside the jury's presence, appellant's
counsel stated that he had "no legal valid objection" to Pero's testimony. Appellant's counsel later
confirmed this when Pero was about to testify before the jury.


 [THE COURT]: Because I think I'm going to admit Pero's testimony. You had no
objection to it.


 [THE DEFENSE]: Well, not a legally valid objection. I object to it just because I
think it's-it's-I don't like any prejudicial evidence introduced against the defendant.


 [THE COURT]: I certainly don't disagree with you on that.


 [STATE]: I'm sorry. I didn't hear anything. What?


 [THE COURT]: He just objects generally to any prejudicial evidence.
25. And, during closing jury arguments, the State argued:


 Even if [appellant] didn't [kill three people in Oak Cliff], even if it's just a statement,
what does that tell you about his state of mind? Middle of his own capital murder
trial, tells the bailiff, you know, I killed three people in Oak Cliff.
26. The Court assumes that the reference to the future-dangerousness special issue is a mistake.
27. In his brief, appellant provides the following argument in support of point of error forty-seven:


 Appellant argues that the trial court erred in instructing the jury to decide any issue
of fact that was not alleged in the indictment returned against the Defendant. 
Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584
(2002). Specifically, the Defendant would object to the jury being asked to
determine whether, taking into consideration all of the evidence, including the
circumstances of the offense, the defendant's character and background and the
personal moral culpability of the defendant there is a sufficient mitigating
circumstance or circumstances to warrant that a sentence of life imprisonment rather
than a death sentence be imposed. The lack of a mitigating circumstance is not
alleged in the indictment and accordingly the jury should not be asked to decide the
question. The court should find that the case is one in which the state cannot seek
the death penalty and sentence the Defendant to life in prison pursuant to [Article
37.071(1), Tex. Code Crim. Proc.]."
28. The record, however, reflects that the jury was instructed that it could not consider extraneous
offenses unless it found beyond a reasonable doubt that appellant committed them.
29. The State claims that the record does not support appellant's factual assertions under point
of error forty-nine and that points of error twenty-five through forty-eight present nothing for review
because they are inadequately briefed. See Tex. R. App. Proc. 38.1.
30. See, e.g., Perry v. State, 158 S.W.3d 438, 446-49 (Tex.Cr.App. 2004), cert. denied, 546 U.S.
933 (2005); Russell v. State, 155 S.W.3d 176, 183 (Tex.Cr.App. 2005); Escamilla v. State, 143
S.W.3d 814, 827-29 (Tex.Cr.App. 2004), cert. denied, 544 U.S. 950 (2005); Rayford v. State, 125
S.W.3d 521, 532 (Tex.Cr.App. 2003); Hughes v. State, 24 S.W.3d 833, 844 (Tex.Cr.App. 2000);
Wyatt v. State, 23 S.W.3d 18, 30 (Tex.Cr.App. 2000); Chamberlain v. State, 998 S.W.2d 230, 238
(Tex.Cr.App. 1999); Pondexter v. State, 942 S.W.2d 577, 587 (Tex.Cr.App. 1996).