Death Opinion






 



 



 

IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,750




 


ADAM KELLY WARD, Appellant
 


v.


 

THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NO. 23,182 IN THE 354th DISTRICT COURT

HUNT COUNTY





 Keasler, J., delivered the unanimous opinion of the Court. 


O P I N I O N

 

 Adam Kelly Ward was convicted in June 2007 of capital murder. (1) Based on the jury's
answers to the special issues, (2) the trial judge sentenced Ward to death. (3) Direct appeal to this
Court is automatic. (4) We conclude that Ward's five points of error are without merit. 
Consequently, we affirm the trial court's judgment.

Facts

 Ward was convicted of intentionally murdering Michael Walker while in the course
of committing obstruction or retaliation. (5) 

 Ward's family was cited numerous times for failing to comply with Commerce City's
housing and zoning codes. At one time, a "demolish order" was issued on the Wards' home,
but the Wards eventually agreed to comply with the codes governing their property. As a
result of the most recent violation--the presence of unsheltered storage--the City imposed
a clean-up deadline of June 11, 2005, or a non-compliance case would be filed with the
municipal court. The Wards did not comply with the notice letter.

 At 10:00 a.m. on June 13, 2005, Walker, a City of Commerce Code Enforcement
Officer, went to the Ward property to record the continuing violation. Walker wore his City
of Commerce work shirt and drove a marked City of Commerce truck. Walker was unarmed,
carrying only his digital camera. Ward was washing his car in the driveway when Walker
arrived.

 After parking his truck, Walker walked the perimeter of the Ward property and took
pictures. At some point, Walker and Ward began arguing. Ward's father came outside and
attempted to calm the men down. Ward then sprayed Walker with water from the hose that
he was using to wash his car. Walker used his cell phone to call his office and request an
officer's assistance. Ward's father tried to reason with Walker and told him, "We need to
sit down and talk about this." But Ward's father became concerned when he noticed that
Ward was no longer outside and advised Walker that it might be "best if he left the property." 
Ward's father then ran to look for Ward, as he believed that Ward had a gun in his room. 
Ward's father did not warn Walker about this fact.

 Walker put his camera in the back of his truck and waited for the officer dispatched
to assist him. However, before Ward's father could intervene, Ward, armed with a .45-caliber pistol, ran out of the house toward Walker and fired at him. Walker tried to use his
truck as cover but Ward pursued him, chasing him around the truck at least twice, firing the
gun again. Walker then ran back towards the Ward home. While in pursuit, Ward shot
Walker several times. Walker finally fell across the sidewalk, and Ward shot him again at
close range. The medical examiner later determined that Walker sustained nine gunshot
wounds. After Walker fell down, Ward's father was able to take possession of the gun from
Ward along with the empty magazine and another fully-loaded clip. 

 In his confession, Ward stated that he believed that the "City" was after his family and
that he had previously been beaten up by the local police. He believed that the police would
kill him if he were arrested again. When Walker arrived, Ward thought that Walker was a
"bad ass, hot head," and he believed that Walker and the former Code Enforcement Director,
Fred Eaton, had "threatened to tear down our house." While Walker was taking pictures,
Ward said that he and Walker got into an argument about how Walker had parked his truck
on the street. Ward stated that Walker then started walking up to him "showing attitude," so
Ward sprayed him with the hose. Ward claimed that, after he sprayed Walker with the hose,
he was in fear of Walker, "just the way he was walking up. He threatened to call the cops
and have--press charges on me and all." Ward stated that he was in fear for his life because,
if the cops showed up to arrest him, he would probably end up dead. Ward said he got his
gun for "self defense" and initially just meant to scare Walker, but he admitted that he knew
he "emptied a magazine" at him. He confessed that he "overreacted" to the situation. There
was no evidence presented confirming Ward's claims that he had ever been beaten by the
police. 

Mental Health Evidence

 In Ward's first three points of error, he contends that the trial judge erred in limiting
evidence of his mental impairment at the guilt phase. After the State rested, Ward offered
testimony from forensic psychologist Dr. Kristi Compton and psychiatrist Dr. Heidi
Vermette, both of whom had testified during Ward's competency trial and had also prepared
mitigation reports. Ward wanted to use their testimony not to show that he was legally
insane, but to negate the mens rea of the aggravating factors of obstruction or retaliation,
which elevated the crime to capital murder. (6) Ward argues that the doctors' testimony would
show that he did not intentionally commit obstruction or retaliation because he believed that
he was acting in defense of himself, his family, and his home. However, Ward did not raise
self-defense, and he concedes that a "diminished capacity" defense does not exist in Texas. (7) 
Ward does not dispute that he was guilty of intentionally murdering Walker. 

 A defendant's right to present a defense includes the due-process right to the
admission of competent, reliable, exculpatory evidence to rebut any element of the offense. (8) 
As with other elements of the offense, the mens rea element may be negated by relevant
evidence, and this evidence may sometimes include evidence of a defendant's mental illness. (9) 
However, such evidence may be excluded under Rule 403 if the probative value of the
evidence is substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury. (10) Such evidence may also be excluded if it does not actually
negate the applicable mens rea. (11) 

 Here, Ward wished to present evidence to negate the required mens rea of obstruction
or retaliation. A person commits the offense of obstruction or retaliation if he intentionally
or knowingly harms or threatens to harm another by an unlawful act: 


 (1) in retaliation for or on account of the service or status of another as a:

 (A) public servant, witness, prospective witness, or informant; or

 (B) person who has reported or who the actor knows intends to
report the occurrence of a crime; or

 (2) to prevent or delay the service of another as a:

 (A) public servant, witness, prospective witness, or informant; or

 (B) person who has reported or who the actor knows intends to
report the occurrence of a crime. (12)

 The trial judge held a hearing outside the jury's presence to determine the relevancy
and admissibility of Ward's proffered testimony. To prevent the State from previewing the
defense's mitigation case, the trial judge agreed to review the defense's witness lists and
Compton's and Vermette's reports in camera. Ward presented the doctors' reports as a
proffer of what their testimony would be at guilt phase of trial. If the trial judge found the
evidence relevant, the reports would be given to the State so it would have the opportunity
to make both relevancy and admissibility objections. If the trial judge found otherwise, the
reports would be sealed for appellate review. Following his review of the reports, the trial
judge determined that Compton's testimony was inadmissible as it was not relevant "to any
issue in the [guilt] phase of trial." On the other hand, the trial judge found that a specific
portion of Vermette's report was admissible and her testimony would be limited to that
portion of her report. All evidence ruled inadmissible was sealed for appellate review. 

 The State argues that the prosecutor should not have been denied access to the expert
reports during the hearing and that Ward violated a pretrial order by not providing the reports
earlier. However, even though the trial judge took protective measures, it appears that the
State was provided with both reports before trial, as the prosecutor referenced actual pages
of the reports during the hearing.

 Vermette testified that, based on her review of Ward's extensive records, testing and
interviews with Ward, and interviews with his family and counsel, Ward suffers from
"mental illness that's best described as psychotic disorder, not otherwise specified, obsessive
compulsive personality disorder, and anti-social personality disorder." She further testified
that Ward's psychotic disorder causes disorganized speech and causes him to suffer paranoid
delusions such that he believes there might be a conspiracy against him and that people might
be after him or trying to harm him. Finally, she testified that Ward was suffering from this
psychotic disorder on the date of the offense. The trial judge provided a lesser-included
instruction on murder in the jury charge.

 In point of error one, Ward asserts that the trial judge reversibly erred in excluding
Compton's testimony. He argues that Compton's testimony was essential to persuade the
jury that "when Ward attacked Walker, he was consciously motivated only by his delusional
beliefs that Walker was attacking him." Compton's report discussed Ward's entire
background and history, described his delusional system, and concluded that Ward "lacked
the requisite mens rea to form intent." 

 Ward argues that he did not intend to use the evidence to show that he was incapable
of ever forming the intent necessary to commit capital murder, only that he did not have the
mens rea to commit obstruction or retaliation. Ward concedes that our holding in Jackson
v. State does not allow the defense to argue that the defendant is absolutely incapable, i.e.,
does not have the capacity to intentionally or knowingly perform an act. (13) Rather, Ward
asserts that he was "attempting, through expert testimony, to negate the mens rea requirement
by showing that [he] did not act in retaliation, but rather out of a delusional belief that he was
under attack by an employee of the City of Commerce."

 We review a trial judge's decision to admit evidence under an abuse of discretion
standard. (14) A trial judge abuses his or her discretion only when the decision lies "outside the
zone of reasonable disagreement." (15) If the ruling was correct on any theory of law applicable
to the case, in light of what was before the trial judge when the ruling was made, then we will
uphold the judgment. (16) 

 Here, Ward told the trial judge that he was not raising self-defense and that he was not
challenging his intent to murder Walker. Further, he did not raise an insanity defense. 
Instead, Ward challenged only his mens rea to commit the aggravating offense of obstruction
or retaliation. 

 The record shows that Compton's report focuses on her opinion that Ward's paranoid
delusions were created by, and learned from, Ward's father. This, in conjunction with
Ward's psychosis, led Ward to believe that most members of the Commerce City government
were out to get his family. This delusion led him to believe that he was being attacked by
Walker--a city employee. Therefore, Ward responded in a manner consistent with his
delusion. Compton concludes that Ward "lacked the requisite mens rea to form intent." 
Compton then defines "intent" as "a rational and cohesive thought pattern in which a person
is able to regulate their thought patterns and express their behavior in congruence with their
thoughts." Ward relies on Compton's opinion that he did not form the "intent" to obstruct
or retaliate.

 Texas Penal Code Section 6.03 defines "intentional" and "knowingly" as follows:

 (a) A person acts intentionally, or with intent, with respect to the nature of his
conduct or to a result of his conduct when it is his conscious objective or
desire to engage in the conduct or cause the result.

 (b) A person acts knowingly, or with knowledge, with respect to the nature of
his conduct or to circumstances surrounding his conduct when he is aware of
the nature of his conduct or that the circumstances exist. A person acts
knowingly, or with knowledge, with respect to a result of his conduct when he
is aware that his conduct is reasonably certain to cause the result.

Under the statutory definition, Compton's report does not negate the required mens rea for
retaliation or obstruction. Instead, her report merely provides an explanation for the motive
behind Ward's retaliation or obstruction of Walker--that Ward was indoctrinated over time
to distrust the government and to believe there was a conspiracy to get his family. 
Consequently, Compton's report reinforces the theory that Ward attacked Walker because
Walker worked for the City or because he wanted to stop Walker from calling the
authorities. (17) 

 As in Jackson, (18) the evidence Ward proffered presented only an excuse for the crime:
that Ward intentionally killed Walker because he was so paranoid that he thought Walker,
as a city employee, was out to get him. As we explained in Jackson, Texas law does not
recognize such an excuse. (19) Further, under Rule of Evidence 403, Compton's testimony
could have been overly confusing or misleading to the jury. The jury was charged with
applying the statutory definition to the facts of the case, and Compton's definition of "intent"
varied significantly from the statutory definition. Therefore, we conclude that the trial judge
did not abuse his discretion by excluding Compton's report or testimony. Point of error one
is overruled.

 In Ward's second point of error, he complains that the trial judge erred in limiting
Vermette's testimony at the guilt phase. Specifically, he argues that Vermette should have
been allowed to testify regarding Ward's specific delusions at the time of the offense and
how those delusions affected his mental state with regard to his intent to retaliate or obstruct. 
We do not need to reach the merits of Ward's claim because it was not preserved for review.

 To preserve a complaint for appellate review, a defendant must specifically object and
then either secure a ruling or object to the court's refusal to issue a ruling. (20) At the hearing,
Ward proffered Vermette's report as a representation of her proposed testimony. The trial
judge ruled:

 I am prepared to consider Dr. Vermette's testimony in the limited capacity of
the clinical impressions regarding mental illness with some guidelines and
caveats. One, only as to the symptoms of such orders--or disorders and only
how they might affect the obstruction and retaliation issues, not the murder
issues.


 And that no opinions be expressed as--obviously as to competency but
as to the mens rea intent or the effect on the mens rea intent.


The trial judge then noted that Vermette's testimony would be limited to two and one-half
pages of her report, starting at page nineteen. At this point, not only did Ward not object to
the trial judge's ruling, but counsel stated, "I appreciate your ruling and I respect it and
whatever." Counsel also informed the trial judge that there was nothing else that they needed
to discuss outside the presence of the jury. 

 After Vermette's testimony on voir dire, the trial judge ruled that Vermette could
testify regarding: (1) any mental impairment or mental illness that she found in Ward when
she examined him; (2) whether, based on her professional knowledge, experience, and what
she had reviewed, any of those illnesses and their symptoms existed on June 13, 2005; and
(3) explanations of "a particular symptom, what it does, whether it causes delusions or what
kind of behavior it may cause." Again, Ward did not object. Then, with Ward's consent, to
prevent the jury from considering the evidence for insanity or competency, the trial judge
gave the following limiting instruction prior to Vermette's testimony:

 And that is, Ladies and Gentlemen, that the testimony of [Vermette] is
admitted for the sole purpose of assisting the Jury, if it does, in determining
what mental impairments or illness, if any, [Ward] had on June 13, 2005. And
if he had any, how, if at all, those impairments or illnesses influenced the
mental state of [Ward] on June 13, 2005. And it is admitted for no other
purpose.

 Next, even if Ward had preserved his claim, we would find no abuse of discretion. 
Vermette, herself, testified on voir dire that her report was not done for the purposes of trying
to look back and see what Ward's "mental state" was on the date of the offense. She stated
that she could not form an opinion about Ward's mental state at the time of the offense, but
she could testify about how his perception of reality is distorted by his mental illness and that
he had the same illness at the time of the offense--the testimony ultimately presented before
the jury. Point of error two is overruled.

 In Ward's third point of error, he posits that his Fourteenth Amendment federal due-process rights were violated by the exclusion of Compton's testimony and the limitation of
Vermette's testimony. Ward assumes that the trial judge erred in excluding or limiting the
evidence. As we have already held that the trial judge did not err, Ward's due-process rights
were not violated. Additionally, we note that the United States Supreme Court has held that
there is no due-process violation when all "mental disease" evidence at the guilt phase is
excluded when it is offered to rebut the mens rea element. (21) Therefore, point of error three
is overruled. 

Death-Penalty Scheme In point of error four, Ward contends that the Texas death-penalty scheme is
unconstitutional because it fails to provide uniform, statewide standards to guide prosecutors
in their decisions to seek the death penalty. He argues that this failure violates his rights
under the Equal Protection Clause to the Fourteenth Amendment. We have previously
rejected the notion that there should be "a statewide policy or standard for determining in
which cases the State will seek the death penalty as opposed to leaving the decision in the
hands of the individual district attorneys." (22) Ward relies upon Bush v. Gore, (23) but we have
rejected the argument that a disparity in death-penalty decision making from county to county
violates the principles articulated in that decision. (24) Point of error four is overruled.

 In Ward's fifth point of error, he contends that Texas's capital-sentencing statute
impermissibly prevented the jury from giving meaningful consideration and effect to his
constitutionally relevant mitigating evidence under Penry v. Lynaugh (Penry I). (25) He argues
that the statute is both contrary to and is an "unreasonable application of clearly established
Federal law." Ward then mistakenly avers that he received jury instructions similar to those
in Penry I: (1) whether he had committed the offense deliberately, and (2) whether it was
probable that he would commit future violent acts constituting a continuing threat to society. 
He argues that his trial was "flawed by the same constitutional error" as in Penry I. 

 Because Ward committed this offense after September 1, 1991, the trial judge gave
the jury instructions set out in the current version of Article 37.071: (1) whether he is a future
danger, and (2) "[w]hether, taking into consideration all of the evidence, including the
circumstances of the offense, the defendant's character and background, and the personal
moral culpability of the defendant, there is a sufficient mitigating circumstance or
circumstances to warrant that a sentence of life imprisonment rather than a death sentence
be imposed." (26) The jurors were also instructed that they did not need to agree on what
particular evidence they found to be mitigating in order to answer the second special issue,
"yes." (27) 

 We have previously considered the current capital-sentencing statute in light of Penry
I and have repeatedly held that the instructions allow jurors to give meaningful consideration
and effect to mitigating evidence in accordance with clearly established federal law. (28) Ward
provides us with no new argument that persuades us to reconsider our holdings. Point of
error five is overruled.

 We affirm the trial court's judgment.


DELIVERED: February 10, 2010

DO NOT PUBLISH 
1. Tex. Penal Code Ann. § 19.03(a). 
2. Tex. Code Crim. Proc. Ann. art 37.071 §§ 2(b), 2(e)
3. Tex. Code Crim. Proc. Ann. art. 37.071 § 2(g). 
4. Tex. Code Crim. Proc. Ann. art. 37.071 § 2(h). 
5. Tex. Penal Code Ann. § 19.03(a)(2). 
6. See id
. 
7. See Ruffin v. State, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008) (Texas has not
enacted any affirmative defenses, other than insanity, based on mental disease, defect, or
abnormality). 
8. Id. at 594. 
9. Jackson v. State, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005).
10. Id. at 574; Tex. R. Evid. 403.
11. Ruffin, 270 S.W.3d at 596.
12. See Tex. Penal Code Ann. § 36.06(a).
13. 160 S.W.3d at 574-75.
14. Walters v. State, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007); Zuliani v. State,
97 S.W.3d 589, 595 (Tex. Crim. App. 2003). 
15. Id.; Cantu v. State, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992). 
16. State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); Romero v. State, 800
S.W.2d 539, 543-44 (Tex. Crim. App. 1990).
17. Cf. Ruffin, 270 S.W.3d at 596 (at trial for aggravated assault on a public servant,
mental health evidence admitted to show that, due to his delusions, defendant believed he
was shooting at Muslims, not police, because it was relevant to show defendant did not
intend to shoot a police officer).
18. 160 S.W.3d at 572 (mens rea of murder not negated by evidence that defendant
killed his brother because he was so paranoid that he thought his brother was out to get
him).
19. Id. 
20. Tex. R. App. Proc. 33.1(a). 
21. Clark v. Arizona, 548 U.S. 735, 779 (2006). 
22. Roberts v. State, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007); Crutsinger v.
State, 206 S.W.3d 607, 611-13 (Tex. Crim. App. 2006); Hankins v. State, 132 S.W.3d
380, 387 (Tex. Crim. App. 2004).
23. 531 U.S. 98 (2000).
24. Roberts, 220 S.W.3d at 535; Threadgill v. State, 146 S.W.3d 654, 671-72 (Tex.
Crim. App. 2004).
25. 492 U.S. 302 (1989).
26. Tex. Code Crim. Proc. Ann. art. 37.071 §§ 2(b)(1), 2(e)(1). 
27. Tex. Code Crim. Proc. Ann. art. 37.071 § 2(f)(3).
28. See Busby v. State, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); Saldano v.
State, 232 S.W.3d 77, 107-09 (Tex. Crim. App. 2007).