

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-71,224

**MARK ROBERTSON Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL
### FROM CRIMINAL DISTRICT COURT NUMBER FIVE
### DALLAS COUNTY

**KELLER, P.J., delivered the opinion of the unanimous Court.**

In 1989 appellant was indicted for capital murder in the course of robbery. In 1991 he was tried and sentenced to death. His sentence was affirmed on direct appeal.[1] In 2008, this Court granted a new punishment hearing[2] under *Penry II*.[3] In July of 2009, appellant was again sentenced

---

[1] *Robertson v. State,* 871 S.W.2d 701 (Tex. Crim. App. 1993).

[2] *Ex parte Robertson,* No. 74,720, (Tex. Crim. App. Mar. 12, 2008).

[3] *Penry v. Johnson,* 532 U.S. 782 (2001).

to death.  Direct appeal to this Court is automatic.[4]  Finding no reversible error, we shall affirm.

## I. SUFFICIENCY OF THE EVIDENCE

### A. Legal Sufficiency – Future Dangerousness

In issue number twenty-four, appellant argues that the evidence is legally insufficient to support the jury's answer to the future dangerousness special issue because, at the time of his new trial on punishment, he had spent eighteen years on death row with no violent infractions.  He asserts that, because of this, it is evident that he would not constitute a continuing threat to society.

When assessing whether there is sufficient evidence of future dangerousness, we review the evidence in the light most favorable to the jury's affirmative answer and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would constitute a continuing threat to society.[5]

A jury may consider a variety of factors when considering the future dangerousness issue, including: the circumstances of the offense, including the defendant's state of mind and whether he was working alone or with other parties; the calculated nature of his acts; the forethought and deliberation exhibited by the crime's execution; the existence of a prior criminal record and the severity of the prior crimes; the defendant's age and personal circumstances at the time of the offense; whether the defendant was acting under duress or the domination of another at the time of the offense; psychiatric evidence; and character evidence.[6]  The circumstances of an offense can be some of the most revealing evidence of future dangerousness and may be sufficient to independently

---

[4] TEX. CODE CRIM. PROC. art. 37.0711, §3(j).

[5] *Estrada v. State,* 313 S.W.3d 274, 284 (Tex. Crim. App. 2010).

[6] *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

support an affirmative answer to the future dangerousness issue.[7] The special issue focuses upon the particular individual's character for violence, not merely the quantity or quality of the institutional restraints put on that person.[8]

In the instant offense, appellant killed two people. He ambushed nineteen-year-old Sean Hill while Hill was fishing, and he shot Hill's grandmother, Edna Brau, between the eyes while she slept. After his arrest, witnesses described him as smiling and indifferent, as if it were a joke.[9]

The State presented evidence of other offenses and bad acts, including evidence that appellant, as a young teenager, brought a gun to school and threatened to shoot other students. Appellant had strangled cats and had stomped birds to death.[10] He had also committed armed robbery and a wide variety of drug-related offenses.[11] While he was on deferred adjudication for an aggravated robbery, appellant killed 7-Eleven store employee Jeffrey Saunders.

Appellant's psychologist, Dr. Compton, testified that at the time of the offense appellant was a sociopath, and at the time of trial he was still diagnosed with anti-social personality disorder, for which there is neither cure nor treatment. Dr. Compton also testified that appellant exhibited narcissism, grandiosity, manipulative behavior and that he displayed signs of remorse for his crimes only as his execution date drew near. Dr. Compton agreed that the restrictive death row environment

---

[7] *Druery v. State,* 225 S.W.3d 491, 507 (Tex. Crim. App. 2007).

[8] *Coble v. State,* __ S.W.3d __ 2010, Tex. Crim. App. LEXIS 1297 (Tex. Crim. App. Oct. 13, 2010).

[9] *Garcia v. State,* 126 S.W.3d 921 (Tex. Crim. App. 2004).

[10] *Davis v. State,* 313 S.W.3d 317, 348 (Tex. Crim. App. 2010).

[11] *Howard v. State,* 153 S.W.3d 382, 384 (Tex. Crim. App. 2004).

limits anti-social behavior.

Viewed in the light most favorable to the verdict, there is sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. Issue number twenty-four is overruled.

### B. Factual Sufficiency

In issues twenty-five and twenty-six, appellant urges us to examine the factual sufficiency of the evidence to support the jury's answer to the future-dangerousness special issue. This court does not review future dangerousness for factual sufficiency.[12] Furthermore, we no longer conduct factual-sufficiency analyses for issues on which the State carries the burden of proof beyond a reasonable doubt.[13] Issues twenty-five and twenty-six are overruled.

### C. Factual Sufficiency - Mitigation

In issues thirty-two and thirty-three, appellant claims that the jury's answer to the mitigation special issue was against the weight and preponderance of the evidence. We do not conduct a sufficiency review of the jury's answer to the mitigation special issue.[14] Issues thirty-two and thirty-three are overruled.

### II. *VOIR DIRE* ISSUES

### A. *Batson* Challenge

---

[12] *See McGinn v. State,* 961 S.W.2d 161, 169 (Tex. Crim. App. 1998).

[13] *See Brooks v. State,* 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

[14] *See e.g., Green v. State,* 934 S.W.2d 92, 106-07 (Tex. Crim. App. 1996); *Prystash v. State,* 3 S.W.3d 522, 535-36 (Tex. Crim. App. 1999).

In issue number one, appellant claims that the trial court erred in overruling his *Batson*[15]

challenge to the State's peremptory strike of prospective juror McClendon. *Batson* provides a three-

step process for a trial court to use in deciding a claim that a peremptory strike was based on race:

> First, a defendant must make a prima facie showing that a peremptory challenge has
> been exercised on the basis of race. Second, if that showing has been made, the
> prosecution must offer a race-neutral basis for striking the juror in question. Third,
> in light of the parties' submissions, the trial court must determine whether the
> defendant has shown purposeful discrimination.[16]

A trial court's ruling on the issue of discriminatory intent must be sustained unless it is

clearly erroneous.[17] Often the best evidence of discriminatory intent is the demeanor of the

prosecutor exercising the challenge.[18] Step three of the *Batson* inquiry includes an evaluation of the

prosecutor's credibility.[19] Additionally, race-neutral reasons for peremptory challenges often turn

on aspects of a prospective juror's demeanor, such as nervousness or inattention, causing the trial

court's observations to be even more important.[20] The trial court must evaluate, not only whether

the prosecutor's demeanor shows discriminatory intent, but also whether the prospective juror's

demeanor displayed the basis for the strike.[21] A trial court may perform a comparison of accepted

---

[15] *Batson v. Kentucky,* 476 U.S. 79 (1986).

[16] *Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003)(citations omitted).

[17] *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004).

[18] *Snyder v. Louisiana*, 522 U.S. 472, 477 (2008).

[19] *Batson*, 476 U.S. at 98, n.21.

[20] *Snyder,* 552 U.S. at 477.

[21] *Id*.

jurors versus the challenged juror.[22] Disparate treatment may enter into both the trial judge's assessment of the prosecutor's credibility and the determination of the racial neutrality of the peremptory challenge.[23]

Following McClendon's individual voir dire, the State challenged her for cause. Appellant opposed the strike, and the court denied the challenge. The State then used a peremptory challenge to strike McClendon from the jury. Appellant challenged the strike under *Batson.* In response, the prosecutor stated:

> I want the record to reflect some of these statements were in her questionnaire. She was talking about how alcohol and drugs is a disease, with regards to the genetic predisposition. She talked about voluntary intoxication may not be worthy of a death penalty. Intoxication is a big issue in this case. She talked about how most criminals are actually victims of society, and extenuating circumstances should not be considered. She strongly disagreed on that.
>
> The State felt she was the type of juror – any type of mitigating evidence that would have been presented, she would have latched on to and would have answered that last special issue to the point where the defendant would receive a life sentence instead of the death sentence. And that's only if she became qualified.
>
> It was the State's position, Judge – and I think the Court can even read the transcript with the State and Defense presented after that day, that this juror specifically said, "No, I do not think I could take that oath." And then I pressed her on it. She said, "No, I could not take the oath to sit as a juror in a case like this."
>
> Obviously, the Judge made his ruling and we abided by the ruling. But then someone who we felt couldn't even be comfortable taking the oath and potentially sentencing someone to die, the State was forced to use a peremptory strike on that particular juror. It had nothing to do with the race of the juror or the sex of the juror, it just had to do with her answers throughout her questionnaire, as well as her answers to myself, when I was questioning her.
>
> Another point they brought up was with regards to the Karla Faye Tucker case. She

---

[22] *Young v. State,* 826 S.W.2d 141, 145-46 (Tex. Crim. App. 1991).

[23] *Id.*

would have given that person, who we all know, another chance and would have pardoned her, she said on the record, as well.[24]

So based on a collective of all her answers in the questionnaire, as well as her answers to myself, as well as the fact that we still feel that she couldn't even take the oath to sit on a case like this, that is the reason that the State used a peremptory challenge on Ms. McClendon, juror 1129.

The defense made no attempt to rebut the State's race-neutral explanation and made no further comment. The court denied appellant's *Batson* challenge.

A comparison of McClendon's responses to those of persons acceptable to the State fails to refute the State's race-neutral explanation. Appellant urges that several jurors accepted by the State wanted to hear any and all mitigating evidence, and that others were concerned about the gravity of the decision or might consider intoxication to be a mitigating circumstance. None of the accepted jurors expressed all of these feelings in concert, nor to the degree that McClendon did. Moreover, McClendon was the only one to say that she would be unable to take the oath of a juror, which is the initial reason that the State attempted to strike her for cause.

Viewing the evidence in the light most favorable to the trial court's ruling, we cannot conclude that the trial court's ruling on the peremptory strike of prospective juror McClendon was clearly erroneous. Issue one is overruled.

### B. Challenges for Cause

In issues two through sixteen, appellant claims that the trial court erred in denying appellant's challenges for cause against certain prospective jurors.

---

[24] In reviewing the record, we note that McClendon did not indicate that she would pardon Karla Faye Tucker. However, as the *Batson* challenge was raised two days after the exchange took place, it is likely that Healy confused McClendon with another prospective juror, Ms. Hardy, who was excused by agreement.

To show harm when a challenge for cause is denied, appellant must demonstrate that, on the record, he: 1) asserted a clear and specific challenge for cause; 2) used a peremptory challenge on the complained-of prospective juror; 3) exhausted all of his peremptory challenges; 4) requested additional strikes and was denied; and 5) identified an objectionable juror who served on the jury.[25]

In the present case, the record shows that appellant exhausted his peremptory challenges and received one additional peremptory challenge. In order to show harm, appellant must demonstrate that the trial court erroneously denied his challenge to two complained-of prospective jurors.[26]

We review a trial court's ruling on a challenge for cause with considerable deference because the trial court is in the best position to evaluate the prospective juror's demeanor and responses.[27] This is particularly so when the challenged prospective juror vacillates or seems confused.[28] When reviewing a trial court's decision on a challenge for cause, we look at the entire record of voir dire to determine if there is sufficient evidence to support the trial court's ruling.[29] We will reverse a trial court's ruling on a challenge for cause only if an abuse of discretion is evident.[30]

A prospective juror may be challenged for cause for bias against any phase of the law upon which the State or the defendant is entitled to rely.[31] Bias against the law is refusal to consider or

---

[25] *Sells v. State*, 121 S.W.3d 748, 758 (Tex. Crim. App. 2003).

[26] *Davis,* 313 S.W.3d at 343.

[27] *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007) (citing *Colburn v. State,* 966 S.W.2d 511 (Tex.Crim.App. 1998)) (internal quotations omitted).

[28] *Garcia v. State,* 919 S.W.2d 370, 401 (Tex. Crim. App. 1996).

[29] *Feldman v. State,* 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

[30] *Saldano,* 232 S.W.3d at 91 (internal quotations omitted).

[31] TEX. CODE. CRIM. PROC. art. 35.16 (b)(3), (c)(2).

apply the relevant law.[32] A prospective juror is biased when his beliefs or opinions would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.[33] However, before a prospective juror can be excused for cause on this basis, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views.[34] The proponent of a challenge for cause does not meet his burden until he has shown that the prospective juror understood the requirement of the law and could not overcome his prejudice well enough to follow it.[35]

In issue number two, appellant claims that the trial court erred in denying his challenge for cause against prospective juror Westlund. At trial, appellant objected to Westlund because she would shift the burden of proof on mitigation to the defense; thus, she would not be able to follow the oath required of a juror.

No burden of proof exists for either appellant or the State on mitigation.[36] Appellant bears a burden of production on mitigation, however.[37] It was not clear from Westlund's answers that she understood this distinction. An examination of the record shows that this distinction was not explained to her, nor was she asked if, understanding the law, she could set aside her personal views

---

[32] *Sadler v. State,* 977 S.W.2d 140, 142 (Tex. Crim. App. 1998) (citing *Riley v. State,* 889 S.W.2d 290, 295 (Tex. Crim. App. 1993)) (internal quotations ommitted).

[33] *Sadler,* 977 S.W.2d at 142.

[34] *Feldman,* 71 S.W.3d at 744.

[35] *Id.* at 747.

[36] *Colella v. State,* 915 S.W.2d 834, 845 (Tex. Crim. App. 1995) (citing *Barnes v. State,* 876 S.W.2d 316, 330 (Tex. Crim. App. 1994)).

[37] *McFarland v. State,* 928 S.W.2d 482, 498 (Tex. Crim. App. 1996).

and follow the law. Moreover, a prospective juror is not challengeable for cause "simply because he would place the burden of proof on mitigation on the defense."[38] The record does not indicate any abuse of discretion in denying the challenge. Issue number two is overruled.

In issues number three, four, and six through fifteen appellant claims that the trial court erred in denying his challenges for cause against prospective jurors Slaten, Arnett, Massey, Combs-Hollie, Dent, Spurger,[39] Donihoo, Stanberry, Wetzel, Williams, Wallin[40] and Stanford. Citing Justice Scalia's dissent in *Morgan v. Illinois*[41] for support, appellant objected that these prospective jurors "[could] not give equal consideration to Mr. Robertson's mitigation, given the facts." Because appellant expected to introduce certain types of evidence that these prospective jurors indicated that they would not find mitigating, appellant argues that these prospective jurors were biased against him, his evidence, and the law on which he would rely, and were incapable of taking the juror's oath. Appellant submitted a written objection and argument on these grounds, referred to as "Trial Objection Number 1." Later challenges based on this ground were sometimes simply communicated to the court as challenges based on "trial objection one."

In *Standefer v. State*, we held that "a prospective juror is not challengeable for cause simply

---

[38] *Saldano,* 232 S.W.3d at 92.

[39] Spurger was also challenged on the basis of a physical impairment. During voir dire, Spurger explained that she consulted with her doctor about participation in the trial, and that as long as she took her medication and was allowed periodic breaks, this would not interfere with her service as a juror.

[40] Appellant also objected that "[Wallin] doesn't have a clue of what we're doing here." A complete review of the record shows that before voir dire Ms. Wallin was simply unaware of the law, and that when it was explained to her she understood and could follow it.

[41] 504 U.S. 719 (1992).

because he does not consider a particular type of evidence to be mitigating."[42]  "[W]hether a prospective juror considers a particular type of evidence to be mitigating is not a proper area of inquiry."[43]  Also, a prospective juror is not required to give an example of something that he would consider mitigating.[44]  Issues three, four, and six through fifteen are overruled.

In issue number sixteen, appellant claims that the trial court erred in denying his challenge for cause against prospective juror Jordan on the basis of trial objection number one. As explained above, a juror is not required to find any particular evidence to be mitigating.  Appellant also argues in his brief that Jordan would automatically find appellant to be a future danger.  Appellant did not allege this reason as part of his challenge to the trial court.  To preserve error, a complaining party must make a timely and specific request, objection or motion and obtain a ruling from the trial court.[45]  This claim was not preserved for appeal.[46]  Moreover, when the law was clarified to him, Jordan stated that he would require the State to prove future dangerousness beyond a reasonable doubt.  Issue number sixteen is overruled.

In issue number nineteen, appellant claims that the trial court erred in denying trial objection number one as to each member of the venire.  As explained above, this court has held that a prospective juror is not challengeable for cause simply because he does not consider a particular type

---

[42]  *Standefer v. State*, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001) (citing *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998)).

[43]  *Id.*

[44]  *Threadgill v. State,* 146 S.W.3d 654, 668 (Tex. Crim. App 2004).

[45]  TEX. R. APP. P. 33.1.

[46]  *Harris v. State,* 784 S.W.2d 5, 27 (Tex. Crim. App. 1989).

of evidence to be mitigating, and whether a juror considers a particular type of evidence mitigating is not a proper area of inquiry.[47]   Issue number nineteen is overruled.

In issue number twenty-one, appellant argues that the trial court erred in overruling his objection to the unconstitutionality of the jury selection process as a whole.  He asserts that because the trial court denied his strikes for cause against jurors who "[could] not consider Mr. Robertson's mitigation evidence," the jury was unconstitutionally formed, denying him due process and a fair trial.  Appellant argues that state judges in Texas are not adequately trained in applying federal law in death-penalty cases, that the trial court did not correctly apply the law in this case, and that this led to an unconstitutional jury in appellant's case.

This amounts to a claim that, because the trial court overruled trial objection number one, the jury was unconstitutionally formed.  *Morgan* provides that a juror who will automatically vote for the death penalty may be removed for cause.[48]  It does not require a commitment to believe any particular type of evidence to be  mitigating.[49]  As explained above, a prospective juror is not challengeable for cause simply because he may or may not consider any particular type of evidence to be mitigating.[50]  Further, whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry.[51]  Thus, a trial court does not err by refusing to allow a defendant to

---

[47]  *Standefer,* 59 S.W.3d at 181.

[48]  *Morgan,* 504 U.S. at 738.

[49]  *See Id.*

[50]  *Standefer,* 59 S.W.3d at 181.  *See also Raby v. State*, 970 S.W.2d 1 (Tex. Crim. App. 1998), *Green v. State,* 912 S.W.2d 189 (Tex. Crim. App. 1995).

[51]  *Standefer,* 59 S.W.3d at 181.

ask prospective jurors questions based on facts peculiar to the case on trial.[52] All that the law requires is that a defendant be allowed to present relevant mitigating evidence and that the jury be provided a vehicle to give effect to that evidence if the jury finds it to be mitigating.[53] A review of the record and the preceding issues demonstrates that the trial court did not err in its rulings. Issue twenty-one is overruled.

In issue number five, appellant claims that the trial court erred in denying his challenge for cause against prospective juror Murphy. Appellant objected that Murphy was biased against him and would not consider his, nor any other, mitigating evidence. In a conference out of Murphy's presence, the parties agreed that the court should further question him. Subsequently, the court recalled Murphy and questioned him directly about his ability to be fair and impartial, and follow the law. The court asked:

> Would you be predisposed to not consider any mitigating evidence? Or can you keep an open mind? Can you consider any evidence that might be presented by either side, understanding that neither side has the burden of proof? Or something you've heard through the course of the trial that you thought was sufficient-mitigating circumstance, [sic] to extend a life sentence to the defendant rather than the death penalty and answer the question 'yes' – and that's what the law would require you to do. Can you do that? If you can't, then you need to tell us you can't. If you can, then you need to tell us you can. Only you know.

Murphy responded that yes, he could consider the mitigation issue, and the challenge for cause was denied. After examining the entire record, and in light of the appropriate deference to the trial court's ruling, we do not find an abuse of discretion in denying this challenge. Issue number five is overruled.

---

[52] *Raby,* 970 S.W.2d at 3.

[53] *Id.*

In issues number seventeen and eighteen, appellant contends that the erroneous denial of his challenges for cause detailed above deprived him of a lawfully constituted, unbiased, and unprejudiced group of jurors. He claims that this denied him a fair trial in violation of the United States Constitution, the Texas Constitution and the Texas Code of Criminal Procedure. These objections were not presented to the trial court; thus they are not preserved for review. We further note that none of the denied challenges for cause that appellant complains of were erroneous. Issues seventeen and eighteen are overruled.

In issue number twenty, appellant claims that the trial court erred in denying "trial objection number two" as to each and every member of the venire. Trial objection number two is a written objection to "improper exclusion of [a] juror with scruples against death"[54] and appellant was allowed a running objection on this basis. Appellant does not now argue that any jurors were improperly excluded on this basis, nor does he argue that he was harmed. Appellant's brief pairs the argument for this issue with the argument for issue nineteen, but it does not argue any issue presented in trial objection number two; thus this claim is inadequately briefed.[55] Issue number twenty is overruled.

### III. TRIAL ISSUES

### A. False Testimony

In issues twenty-two and twenty-three, appellant claims that the trial court erred in denying his motion for new trial, and for denying him a fair trial and due process in violation of the Fifth,

---

[54] In fact, trial objection number two appears to be a script for counsel to follow when making an objection to the trial court, rather than an objection in its own right.

[55] TEX. R. APP. P. 38.1(i).

Sixth, Eighth and Fourteenth Amendments to the United States Constitution. He asserts that the State knowingly presented false and highly misleading testimony about appellant's future dangerousness.

Due process is offended when the State knowingly or unknowingly offers material evidence that is false or misleading .[56] An examination of the evidence adduced at trial demonstrates that it was neither false nor misleading – thus we need not address its materiality.

The State called Warden Melodye Nelson as an expert witness about future dangerousness. Warden Nelson described how an inmate's living conditions are restricted through the use of a classification system ranking inmates from G1 (least restrictive) through G5 (most restrictive) and administrative segregation. Appellant complains about the warden's statements concerning the following: that appellant would automatically be classified as a G3 inmate; that prison personnel are underpaid and short staffed, that one officer may look after 150 inmates, and that a year previously the Texas Department of Criminal Justice was 4,000 officers short; that there is more violence in the general population than in administrative segregation; that inmates can come and go from their cells to work; and that prison is filled with psychopaths. At appellant's hearing on the motion for new trial, appellant presented experts S.O. Woods and Dr. Mark Vigen, whose testimony was intended to counter the warden's testimony and show that her testimony was false or misleading.

Although appellant did not object to this testimony contemporaneously, the trial court granted a hearing on the motion. Assuming, without deciding, that appellant's complaints were preserved, we will address the issues.

**1. *Appellant would automatically be classified as a G3 inmate.***

---

[56] *See Napue v. Illinois,* 360 U.S. 264, 269 (1959).

Warden Nelson testified at trial that if appellant were sentenced to life with parole (under the law in effect at the time of his conviction) he would be automatically classified as a G3 prisoner, a classification including any offender sentenced to fifty years or more who had not served at least ten years. She further testified that after ten years a G3 inmate would be eligible for promotion to G2 status. Because appellant's disciplinary record during the eighteen years he spent on death row contained only minor infractions, the warden stated that he would automatically be categorized as a G2 if given a life sentence. At the hearing on the motion for new trial, the State also presented an affidavit from Cay Cannon, a member of the State Classification Committee, opining that appellant would be classified as a G2.

At the hearing, Woods stated that, "As far as the G3 being an automatic, that's the rule of thumb for any sentence over fifty years, new inmate less than ten years of service time, those kinds of factors." He disagreed with Warden Nelson's use of the word "automatic," stating that it "was not a good choice of words." He explained that although TDCJ uses software that automatically determines an offender's status, TDCJ personnel may override this classification if there are reasons to do so.

Although Woods disagreed with the warden's choice of words, the evidence indicates that appellant was eligible for G2 status if given a life sentence. Further, analysis of appellant's disciplinary record by the experts showed no reason that the automatic classification produced by TDCJ software would have been overridden by TDCJ classification personnel.

*2. Prison personnel are underpaid and short staffed, that an officer may look after 150 inmates, and that a year previously TDCJ was 4000 officers short.*

Warden Nelson testified that TDCJ employees are underpaid, stating that an entry-level

correctional officer received "about the same as what a Wal-Mart warehouse worker [did]." She also indicated that there was rapid turnover, chronic under-staffing, and that "one staff member may be in charge of up to 150 offenders." She explained that because of this it was difficult to keep control over inmate access to contraband. She also explained that although she did not know the current figure, TDCJ was short 4,000 personnel the year before, and this shortage was not evenly distributed throughout the system. Rather, some units were very short-staffed, particularly in remote areas.

Woods testified that his investigation did not turn up anyone at TDCJ who agreed that one guard supervising 150 inmates was a typical situation. He stated that using current TDCJ employment figures and inmate figures, he calculated that there was approximately one guard for every eight inmates and that the worst case was one guard for every eighteen inmates, but "the fact is that TDC [sic] is such a complex operation and it consists of so many different variety of units that it's impossible to come up with anything like a ratio that says there's so many officers to so many inmates." He stated that there were occasions where inmates would be under "indirect supervision" such as in chow halls or in a recreation yard "where one or two or three officers might supervise large groups of inmates." Woods acknowledged that he did not know about the 4,000 figure of two years before, but that as of two weeks before, TDCJ was short 900 officers.

Because the warden's testimony referred to a specific time period, and because there is no evidence of any inaccuracy in the warden's statement, there is no reason to believe that any juror was confused or misled by her testimony about TDCJ staffing.

### 3. General population has more violence than administrative segregation.

Warden Nelson testified at trial that incidents of violence were more prevalent in general population than in administrative segregation or death row. Woods testified at the hearing that

although he cannot refute the warden's statements statistically, "It's common sense" that those inmates on administrative segregation are more dangerous. Woods agreed, however, that simply because of the size of the general population, there is more opportunity for violence, concluding that the warden's testimony did not give a false impression about the amount or nature of violence in prison.

Appellant asserts that Warden Nelson's testimony was misleading but does not suggest how it was so. Although appellant's expert might have delivered the information differently, the testimony itself did not give the jury a false impression.

### 4. *Inmates can come and go from their cells to work.*

At trial, the following exchange occurred between defense counsel and Warden Nelson:

Q. Now, when these people who were work-eligible in the G3s, who have some sort of a job somewhere in the system, they don't get up in the morning after the alarm goes off, walk out of their cell, walk out into the hallway and go to wherever it is they've got a job, do they?

A. Yes, sir.

Q. They do?

A. Yes, sir.

Q. And how -- how are they controlled at all then, if they can have that much freedom?

A. Well, I'll give you a for instance. Let's say they work in the laundry. What would happen is, the laundry staff would call that particular housing area and tell them to turn out all of the laundry workers. The staff that's working that particular living area has what we call a turn-out roster or roster. They'll make a verbal call: "All first-shift laundry workers, get up and go to work." You know, get ready for work. They'll turn 'em out. Say, "Okay. We're going to open all your cell doors. All you laundry workers be at the doors and you all step out." They go and close all the doors. They check 'em off, and then they leave the building. In some cases, staff will call and say, "Tell laundry, hey, I got 'em coming at you." Or they would get

busy turning out kitchen workers and not tell the laundry they had ten coming, and then they would just walk to the laundry. And that's the process for all general population basic offenders who go to work.

Q. Well, that's what I'm saying: There are people who are trying to keep up with them.

A. Uh-huh. Yes. We track them out the door. Yeah.

Q. Right. And they're supposed to wind up where they're supposed to wind up. Otherwise, you know that – or you should know about that, right?

A. We wouldn't know it until a count time showed up and one of 'em wasn't where he was supposed to be. Or they called and – you know, they got down there to the laundry, laundry officer checks 'em all in and maybe an inmate that's on his tracking roster isn't there. He calls that living area and says, "Where is inmate Joe? Well, he turned out?" And then it's a process of trying to figure out where he stopped in the process. Did he go by the medical department? Did he stop in the education department? So we would have a process of elimination, to try and find his physical whereabouts. And we do counts eight times in a 24-hour period. So somewhere in that process, we would be able to find his whereabouts.

Q. That's what I'm saying: You're keeping up with these people. I mean, they're not, willy-nilly, roaming around on their own, like you would when you were working at a 7-Eleven out in the free world: you get up and go inside the 7-Eleven.

A. They're all inside the perimeter fence.

Q. And you watch your count. You worry about it, when they're missing, and then you go find 'em.

A. Yes, sir.

When, at the hearing on the motion for new trial, Woods was asked to describe how inmates move from their cells to their assignments, he replied:

Well, prison in Texas is one of the most structured organizations you'll ever see. Inmates are accounted for constantly. They're physically counted at least once every shift. Usually, a lot more than that. They all have assigned housing areas. They have assigned jobs. They have assigned schools. Everything that they do is dictated to them. So, naturally, their turn-out list of all the housing areas that – say inmate Joe is going to go to this place. There's going to be a person at the other end expecting

him. When he doesn't show up, somebody's going to go looking for him. So if you go onto a unit and walk through a facility, yeah, there's lots of inmates moving up and down the halls, out in the yards and doing various things. But they all have destinations. And that movement is controlled. The hallways are single-file. There's no grouping of inmates or stopping to talk and visit. Those kind of things.

This testimony is substantially identical to that presented by the warden at trial. Woods's testimony does not establish that the warden's testimony was false or misleading.

### 5. *Prison is filled with psychopaths.*

At trial, the prosecution attempted to introduce evidence about the frequency and type of violence in TDCJ generally. Defense counsel objected to the document's relevance, stating that "the law requires individualized punishment" and that "[appellant] can't help it if there are a bunch of psychopaths in prison." Defense counsel's objection was sustained, and examination of Warden Nelson continued discussing opportunities for violence in the general population. The prosecutor later asked Nelson, "I think defense characterized the prison as filled with psychopaths. Do you remember that?" The warden replied that she did. The prosecutor asked if she agreed with that, and the warden replied, "Yes, sir."

At the hearing, Woods testified that there are probably more psychopaths in prison but that it would be inaccurate to say that every inmate is a psychopath. This testimony contradicts neither defense counsel's characterization of prison as being filled with psychopaths nor the warden's agreement. Moreover, appellant opened the door to the question by making the comment.

Appellant has not demonstrated that Warden Nelson's testimony was false or misleading. Furthermore, he has not shown that the trial court abused its discretion in denying his motion for new trial. Issues twenty-two and twenty-three are overruled.

### B. Confrontation

In issue number twenty-seven, appellant asserts that the trial court erred by allowing the State to read testimony by witnesses from the original trial who are now deceased and unavailable for cross-examination. Appellant claims that because the law of mitigation has developed since the original trial, defense counsel at the original trial did not understand what mitigation was. Thus, he claims, defense counsel could not have conducted effective cross-examination to develop mitigation evidence.

The Sixth Amendment's Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him."[57] Generally, prior testimony is admissible only if a witness is unavailable and if the defendant had the opportunity to cross-examine the witness.[58] Texas Rule of Evidence 804(b)(1) permits the use of prior testimony in criminal cases if the defendant had a similar motive to develop testimony. Generally, "when the parties, the charge, and the issues to be litigated are the same in the first and second trials, the two proceedings are necessarily the same and former testimony is admissible."[59]

At this re-trial, appellant objected to the admission of the prior testimony of Milton Gish and Gene Lahourkade, both of whom testified at the 1991 capital murder trial. Gish was unavailable because he was dead, and Lahourkade's mental and physical condition prevented him from testifying. Both witnesses were available for cross-examination at the initial trial. The record from that trial shows that defense counsel was well aware of the mitigation issue. Contrary to appellant's

---

[57] U.S. CONST. amend. VI.

[58] *Crawford v. Washington,* 541 U.S. 36, 68 (2004).

[59] *Martinez v. State,* 327 S.W.3d 727, 739 (Tex. Crim. App 2010)(citing *Bryan v. State,* 837 S.W.2d 637, 644 (Tex. Crim. App. 1992)).

claim that mitigation "didn't really exist much back when this case was tried," *Penry I*[60] had recognized the issue two years before the first trial, and appellant's original trial was replete with mitigation evidence. Defense counsel at the original trial had a motive to present mitigation evidence similar to counsel at re-trial. Whether appellant would have conducted the same cross-examination now does not affect that motive.[61] The trial court did not err in admitting the prior testimony. Issue twenty-seven is overruled.

### C. Confessions

In issues twenty-eight and twenty-nine, appellant contends that the trial court erred in admitting his oral and written confessions to police. In appellant's 1991 trial, defense counsel moved to suppress his statements to police; this motion was denied after a hearing. In his present trial, defense counsel re-urged the objections presented at the original trial, and the trial court responded, "[T]he evidence that came in is still in. The objections originally made to that evidence are still valid objections and are preserved for appellate purposes."

Assuming, without deciding, that this was a specific, timely objection, sufficient to preserve error, if any, we will address his claim. As we stated in our earlier opinion on direct appeal,[62] appellant's oral confession was admitted under Article 38.22, section 3(c) of the Texas Code of Criminal Procedure, which provides:

> Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property

---

[60] *Penry v. Lynaugh,* 492 U.S. 302 (1989).

[61] *Martinez,* 327 S.W.3d at 739 (citations omitted).

[62] *Robertson v. State,* 871 S.W.2d 701 (Tex. Crim. App. 1993).

or the instrument with which he states the offense was committed.

We also stated that:

> The only warnings which must precede an oral confession admitted under section 3(c) are the *Miranda* warnings. In this instance, appellant informed Sergeant Medina of the crime, as well as the crime weapon and its location. Appellant confessed to the sergeant that he had used a .38 caliber pistol, that he had stolen the gun from a car parked at a club in Dallas, and that the gun was in a jewelry box on the floor board in the back seat of the stolen blue Cadillac. Pursuant to appellant's directions, the Nevada police officers located the alleged murder weapon. That weapon was identified by Texas forensic authorities as the murder weapon. Because the confession contains assertions of facts which were found to be true and which help establish appellant's guilt, the confession was admissible under article 38.22, section 3(c) of the Texas Code of Criminal Procedure.[63]

Evidence at the 1991 trial showed that appellant was properly warned as required by *Miranda*; thus, appellant's oral statements were admissible.

Furthermore, although appellant asserts that his written statement is inadmissible as well, an examination of the record shows that the written statement met all the requirements of Article 38.22, section 2 of the Texas Code of Criminal Procedure. Issues twenty-eight and twenty-nine are overruled.

### D. Extraneous Conduct Notice

In issue thirty, appellant claims that the trial court erred by allowing Terry Barron to testify because she was not on the State's extraneous offense list.

The State called Terry Barron as a rebuttal witness after appellant's witness testified that he was "always a good kid and serious round them." Appellant objected that Barron was not on the witness list and that there was no notice of intent to introduce her testimony about an extraneous act. The State explained that it brought Barron in to rebut appellant's mitigation witnesses, it had not

---

[63] *Id.* at 714 (citations omitted).

planned to put her on the stand until a few days before, and it had immediately notified defense

counsel about Barron and the substance of her testimony. The trial court overruled the objection and

allowed Barron to testify.

Texas Code of Criminal Procedure Article 37.0711 provides that evidence may be presented

"as to any matter that the court deems relevant to sentence."[64] Article 37.0711 is identical in this

respect to a previous iteration of Article 37.071 that we have held did not require notice of

extraneous bad acts.[65] Thus, under 37.0711 extraneous-conduct evidence is admissible at the

punishment phase of a capital trial absent a showing of unfair surprise.[66] Although appellant refers

to Barron as a surprise witness, he does not show that he was unfairly surprised. Furthermore, as we

stated in *Jaubert*:

> [W]hen the State presents extraneous offense evidence in rebuttal to mitigation
> evidence offered by the defendant, advance notice of intent to offer the extraneous
> offense evidence is not possible: In such a situation, the defendant, rather than the
> State, determines whether a contested issue will be raised, and his determination will
> not be made known until he presents his case. It would be practically impossible for
> the State to give notice until that time.[67]

Barron's testimony was offered in rebuttal to mitigation evidence suggesting that appellant

valued human life.[68] The State provided notice immediately upon deciding to use Barron's

---

[64] TEX. CODE CRIM. PROC. art. 37.0711, §3(a)(1).

[65] *Hughes v. State,* 24 S.W.3d 833, 842 (Tex. Crim. App. 2000).

[66] *Id.*

[67] *Jaubert v. State,* 74 S.W.3d 1, 4 (Tex. Crim. App. 2002).

[68] Barron's testimony would be admissible under the present iteration of Article 37.071 as well. The current version of Article 37.071 states in relevant part that the introduction of extraneous conduct evidence at the punishment phase of a capital case is governed by the notice requirements of Section 3(g), Article 37.07. Under its plain language, Article 37.07 § 3(g) incorporates by

testimony. Issue thirty is overruled.

### E. Sidebar Comment

In issue thirty-one, appellant claims that the trial court erred by not declaring a mistrial after a sidebar comment by the prosecutor during Barron's testimony. While Barron testified about her background, appellant objected to the relevance of her testimony. The State replied, "Judge, I have no problem, we're going to get there. But I think that the jury is allowed to know somebody who's lived through what she has lived through, has not killed three people." Appellant objected to the State's sidebar comment, and the court sustained the objection. Later on, appellant re-urged his objection, and it was again sustained, whereupon he asked for a mistrial. After an off-the-record discussion, the following exchange occurred:

> Court: Okay. Back on the record.
>
> State: May I proceed, Judge?
>
> Court: Just a moment. There's been an objection by the defense.
>
> Appellant: Can I carry that for a moment and talk – decide how I want to do that?
>
> Court: All right. Proceed. In the meantime, we'll continue with testimony.
>
> Appellant: Yes, sir.

Barron's testimony continued, and she was eventually released. After another witness was called and released, appellant told the court:

---

reference Rule 404(b)'s manner of giving notice. Rule 404(b) requires notice before extraneous crimes or bad acts are admissible in the State's case-in-chief. Thus, we explained in *Jaubert,* Article 37.07's notice requirement applies to evidence of acts introduced during the State's case-in-chief. By extension, since Article 37.071 incorporates the notice requirements of Article 37.07, which in turn incorporates the notice requirements Rule 404(b), Article 37.071's notice requirements apply only to evidence of extraneous offenses or bad acts introduced during the State's case-in-chief on punishment.

> For the record, I want to clear up an objection, Your Honor, I made earlier in the testimony of Terry Barron. I had objected to the testimony of Ms. Barron's brother's horrible childhood, as being sort of mitigating evidence. And the prosecutor made a comment that she did not kill anybody.
>
> I would ask the court to instruct the jury to disregard all the testimony and the comment of the assistant district attorney, regarding her horrible background.

The court then instructed the jury to disregard the State's sidebar comment and denied appellant's subsequent request for a mistrial.[69]

We review a trial court's denial of a motion for mistrial under an abuse-of-discretion standard.[70] The purpose of an instruction to disregard is to cure any harm or prejudice resulting from events that have already occurred.[71] Where the prejudice is curable, an instruction to disregard eliminates the need for a mistrial.[72] A mistrial is required only if "the objectionable events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant."[73]

In this case, the alleged inflammatory event was the State's remark to the judge in a sidebar response to appellant's objections, not a statement intended for the jury. Defense counsel immediately objected to the State's comment, and the trial court ruled in appellant's favor. Defense counsel did not request a mistrial at this time. It was not until appellant asked to clear up his objection, after an intervening witness, that a mistrial was requested and an adverse ruling obtained.

---

[69] The trial court treated this as a timely, specific objection; therefore we will assume, without deciding, that it was.

[70] *Hawkins v. State,* 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

[71] *Young v. State,* 137 S.W.3d 65, 69 (Tex. Crim. App. 2004).

[72] *Id.*

[73] *Id.* at 71.

Assuming that this served as a timely objection, this sort of sidebar remark is curable through an instruction to disregard.[74] We find that the trial court's instruction to disregard sufficed to prevent the jury from being unfairly prejudiced by the State's comment about Barron. Issue thirty overruled.

## IV. DEATH-PENALTY ISSUES

In issues thirty-two through forty-four, appellant presents several challenges to the constitutionality of Texas death penalty law. He acknowledges that these issues have been decided adversely to his position in the past and invites us to reconsider our holdings. We decline to do so.

In issue thirty-six, appellant claims that the trial court erred in denying his motion to preclude the death penalty as a punishment option because state law does not provide a method for determining the death-worthiness of a defendant. This claim has been addressed and rejected previously.[75]

In issues thirty-four, thirty-five and thirty-seven through forty-four, appellant presents issues identical to those presented to this Court in *Saldano.* As we did in *Saldano*, we decline appellant's invitation to review our prior decisions.[76] Issues thirty-two through forty-four are overruled.

The judgment of the trial court is affirmed.

DELIVERED: March 9, 2011
DO NOT PUBLISH

---

[74] *See, e.g., Hendricks v. State,* 640 S.W.2d 932, 939 (Tex. Crim. App. 1982).

[75] *Lucero v. State,* 246 S.W.3d 86, 102 (Tex. Crim. App. 2008).

[76] *Saldano,* 232 S.W.3d at 100-08. In that case, they were points 19, 25, 51, 52, 54, 56, 57, 58, 59, and 61.